**Frances Unoka NWOSOUCHA,**
**Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14-08-01131-CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

Nov. 4, 2010.

---

Anthony P. Griffin, Galveston, for Appellant.

Jessica Alane Caird, Houston, for state.

Panel consists of Justices BROWN and CHRISTOPHER and Senior Justice MIRABAL (MIRABAL, J., dissenting).*

## OPINION

TRACY CHRISTOPHER, Justice.

A jury found appellant Frances Unoka Nwosoucha guilty of engaging in organized criminal activity, namely aggregate theft by a governmental contractor of property with a value of over one hundred thousand dollars and under two hundred thousand dollars. The jury assessed punishment at ten years' confinement, recommended community supervision, and assessed a $10,000 fine. The trial court sentenced appellant accordingly.

In five issues, appellant challenges the denial of her motion for continuance, the validity of the indictment on which she was convicted, the sufficiency of the evidence, and the admission of opinion testimony. Interspersed among these issues are claims of ineffective assistance of counsel. We affirm.

## I. BACKGROUND

In the early 2000s, federal and state investigators discovered rampant fraud in Harris County in billings for Medicare and Medicaid reimbursement for motorized wheelchairs. One of the durable medical equipment companies (DMEs) under investigation was Silver–Hawk, which was owned and controlled by Bibian Uluocha and Achor Uluocha. Many of Silver–Hawk's billings relied on Certificates of Medical Necessity (CMNs) appellant had signed.

On October 15, 2007, a grand jury indicted appellant for engaging in organized criminal activity in combination with Bibian Uluocha, Achor Uluocha, Sharon Thomas, Lewis Gottlieb, and Callie Herpin. The indictment was based on appellant's being a Medicaid provider and "acquiring and otherwise exercising control over property, to-wit: MONEY, owned by SHARON THOMPSON and DUANE DURHAIME [sic] ... of the value of over two hundred thousand dollars."

On March 14, 2008, a different grand jury indicted appellant for the same statutory offense. This indictment was based, however, on appellant's being a Medicaid and Medicare provider and "acquiring and otherwise exercising control over property, to-wit: MONEY, owned by MIRIANA ZOLONDEK and DUANE DURHAIME ... of the value of over one hundred thousand dollars and under two hundred thousand dollars."[1] The assistant grand jury foreman signed the indictment. On the State's motion, the court subsequently dismissed the 2007 indictment.

On March 19, 2008, the State moved to amend the 2008 indictment to add Mark Porter as a complainant, but the court did not sign an order approving the amendment. On May 22, 2008, the State again moved to amend the indictment, request-

---

* Senior Justice Margaret Garner Mirabal sitting by assignment.

1. We derive this conclusion from the printed portions of the indictment rather than the handwritten changes discussed below.

ing to "change one of the complainant's name [sic] from Marianna Zolondek to Sharon Thompson." The State further represented, "As amended, the indictment should read 'Sharon Thompson, Mark Porter and David Duhaime.'" On May 28, 2008, the trial court ordered, "[T]he State of Texas' [sic] motion for leave to amend the indictment should be and hereby is GRANTED as specified in the motion." The indictment of record has a line drawn through Zolondek's name and handwritten additions of Thompson's and Porter's names.[2]

As the case proceeded to trial, first under the 2007 indictment and then under the 2008 indictment, appellant filed three motions requesting continuances. Facing a March 24, 2008 jury trial date, appellant, on February 14, 2008, filed a "Joint Motion to Set Matter Preferentially and to Continue the Current Trial Setting." Referring to the "considerable amount of documents and witnesses," appellant requested a preferential setting in June, July, or August 2008. On March 18, 2008, appellant filed a motion to continue the trial setting for at least ninety days. Appellant again referred to the voluminous documents in the case and argued delay was necessary if she was to receive effective assistance of counsel and a fair trial. Although the record does not contain orders reflecting the court's ruling on these motions, the court reset the trial date to June 2, 2008.

On June 2, 2008, both parties appeared and announced ready; but, because of scheduling problems, the court did not reach the case that week and reset it

preferentially for October 20, 2008.[3] In early September and October 2008, the trial court issued orders for writs of habeas corpus ad testificandum commanding that federal prisoners Lewis Gottlieb, Sharon Thomas, and Callie Herpin be present for the October 20, 2008 trial.

On October 20, 2008, appellant filed her "Second Motion to Continue Trial Setting." She alleged her counsel's Galveston office was closed from September 11 until September 30, 2008, because of Hurricane Ike. As a result, counsel had not been able to complete trial preparation. She further alleged, "Counsel can inform the court that part of the file was damaged, but counsel has been unable to access review [sic] all of the damaged files because of the breadth and scope of the destruction." Finally, she alleged having received a telephone call from the State on September 29 regarding new witnesses and documents. She requested the trial be reset to the December 2008 or January 2009 docket.

At the hearing on the motion, appellant's counsel stated,

> This file in particular, I've been able to locate most of the file because it had been set aside upstairs because it was a current and pending trial file. Some of the file was in the file drawer, which included my theory of the case, as well as my workup with my notes in terms of when I was ready for trial last time.

Appellant argued that, without a continuance, she would be denied effective assistance of counsel and due process.

---

**2.** It is not absolutely clear Duhaime's name was deleted. Without objection, the State subsequently arraigned appellant, alleging, *inter alia,* that she, while "a Medicaid provider and Medicare provider appropriate[d], by acquiring or otherwise exercising control over property; to wit, money, owned by Sharon Thompson and Mark Porter, hereafter called

the complainants, of the value of over $100,000 and under $200,000." Appellant does not complain of the deletion of Duhaime as a complainant.

**3.** This description of the June 2 proceedings occurred at the hearing on appellant's third motion for continuance, discussed below.

The State objected to the motion on several grounds. First, it referred to the timing of the motion; second, to the effect of further delay on the Medicare witnesses who were over the age of sixty-five; third, to the efforts already expended in locating and serving witnesses for the October 20 trial; and finally, to the burden of recalling the medical witnesses, twelve of whom were out of county.

The State also described the new documents as being one month of appellant's bank records, paper copy of a disk already provided to the defense, and a disk listing appellant's activity involving other companies, which had been described in the offense report already in defense counsel's possession. The new witness was an extraneous offense witness.

The trial court expressed its "great concern" it had not seen the motion until the morning of trial, observing that, had it known two or three weeks earlier, it might have been able to provide counsel some assistance. The court also referred to all the witnesses being "on board, ready to go," and October 20 being the second time the State had brought witnesses from federal prison.

The court concluded, "[T]his case has got to be tried and the State has had witnesses and they're losing witnesses and because of that I am just not in a position where I can continue this case any longer." Before proceeding to voir dire, however, the court informed defense counsel: "You are welcome to anything the Court has and we'll be happy to make you a copy. We would have done that earlier, had we known."

Presentation of evidence began October 21.[4] The State presented five general groups of witnesses—Medicare and Medicaid administrators, members of the alleged combination, investigators, wheelchair recipients or their family members, and physicians. The State's case in chief lasted eight trial days, until October 30, 2008.

Medicaid and Medicare administrators described the operation of the Medicaid and Medicare programs, the requirements for DMEs, the documents showing Achor Uluocha's and Bibian Uluocha's interests in Silver–Hawk, and the procedure by which claims are processed. These witnesses described and explained the CMN, which a physician or physician's assistant must sign and a DME must submit in order for the DME to receive Medicare reimbursement. One administrator explained the concept of "progression of disability" in relation to medical necessity and the need to keep a recipient as active as possible.

Members of the alleged combination described the scheme in which Bibian and Achor paid recruiters to locate Medicare beneficiaries or Medicaid recipients and convince them to get "free" power wheelchairs.[5] Bibian and Achor then paid physicians or physician's assistants in cash to sign CMNs authorizing the wheelchairs. Drivers transported the potential recipients to the doctors and sometimes coached the recipients about how to answer the doctors' questions. Testifying members of the combination included two physicians,

---

4. We present a brief summary of the evidence here, with more detailed descriptions in the discussions of sufficiency of the evidence and admission of opinion testimony, below.

5. According to the testimony, persons receiving Medicaid benefits are "recipients"; and

persons receiving Medicare benefits are "beneficiaries." All persons, at a minimum, were receiving Medicare benefits. We refer to "Medicare beneficiaries" and "wheelchair recipients."

Gottlieb and Herpin, and one runner, Thomas, all of whom had been convicted in federal court. A second runner, the granddaughter of a wheelchair recipient, also testified.

A third group of witnesses included the persons involved in the State's investigation of Silver–Hawk. Two witnesses, James Cooper and Russell Bliese, testified about their interviews with wheelchair recipients and their physicians.[6] They described the ability of the recipients to walk. They also described the condition of the wheelchairs or scooters received, reporting many of them appeared not to have been used. Videos of the recipients were introduced during Cooper's and Bliese's testimony. Cooper and Bliese opined some of the recipients were "not qualified" or "not eligible" for wheelchairs under Medicare guidelines. An investigative auditor for the Texas Attorney General's Office, a fraud examiner in the Harris County District Attorney's Office, and an investigator for the United States Department of Health and Human Services Office of Inspector General testified regarding Silver–Hawk's, Bibian's, Achor's, and appellant's bank records and other financial documents.

A fourth group of witnesses consisted of wheelchair and scooter recipients or their family members. In general, they testified to a lack of the recipients' need for, or use of, a wheelchair or a power wheelchair. Appellant had signed the CMNs for six of the eight recipients to whom the testimony pertained.

Finally, thirteen physicians and one physician's assistant testified. Their patients were recipients of the Silver–Hawk wheelchairs. Appellant had signed the CMNs for patients of six of the physicians. In general, they opined they would not have recommended a wheelchair for these patients. Three testified that, to stay as mobile as possible, a patient should use a progression of mobility devices before using a power wheelchair.

Over two and one half days, the defense called seven witnesses, including appellant, a nurse practitioner who practiced, studied, and taught in the United States after emigrating from Nigeria. For the twenty-nine CMNs she admitted signing, appellant testified she believed power wheelchairs were medically necessary and referred to information in the recipients' files as supporting this belief. Recipients' conditions included, but were not limited to, obesity, oxygen dependency, difficulty walking, shortness of breath, hypertension, anemia, osteoarthritis, rheumatoid arthritis, and swollen joints or extremities. She admitted Bibian contacted her, asked appellant to see "clients" for her, and accompanied her on at least two trips to the Palestine, Texas, area, where appellant saw seventeen of the twenty-nine persons for whom she admittedly signed CMNs authorizing a power wheelchair. She denied receiving cash or checks for signing CMNs.[7]

In rebuttal, the State called Aniekan Ekwere.[8] Ekwere testified that, in 2002,

---

6. Cathey Davis, an investigator with the Medicaid Fraud Unit of the Texas Attorney General's Office, testified regarding interviews she conducted with recipients for whom Gottlieb had signed the CMNs.

7. In addition to appellant, the defense called Sharon Thomas, who had been a State's witness; Sunday Nwosoucha, appellant's husband; Cecelia Revila and Stephanie Alvarado,

medical assistants at appellant's health clinic; Teresa Clemons, medical billing and coding specialist at appellant's clinic; and Ekwere A. Akpaffiong, a pharmacist.

8. The State also recalled one of the investigators to authenticate an exhibit relevant to the rebuttal testimony and called Cornelius Andrus, who testified that, on the recommendation of his insurance agent, appellant came to

he started Coastal Medical Supply, a DME, and became a Medicare and Medicaid contractor. He bought CMNs from marketers, then billed Medicare or Medicaid.[9] Some of the CMNs contained only the beneficiary name and the equipment information. On someone's recommendation, Ekwere went to appellant's clinic and asked her to sign the CMNs. She signed four CMNs, and Ekwere paid her five hundred dollars each, in cash.

## II. DENIAL OF APPELLANT'S MOTION FOR CONTINUANCE

In issue one, appellant contends the trial court erred in denying her motion for continuance. She further contends that, as a result of the ruling on her motion, she was denied due process.[10]

### A. Exercise of Discretion

■ We review a trial court's ruling on a motion for continuance for abuse of discretion. *Gallo v. State*, 239 S.W.3d 757, 764 (Tex.Crim.App.2007).[11] To establish

an abuse of discretion, a defendant must show she was actually prejudiced by the denial of her motion. *Id.* Speculation will not suffice to obtain reversal for a trial court's failure to grant a continuance. *See Renteria v. State*, 206 S.W.3d 689, 702 (Tex.Crim.App.2006).

■ An appellate court will conclude the trial court's denial of a motion for continuance was an abuse of discretion " 'only if the record shows with considerable specificity how the defendant was harmed by the absence of more preparation time than he actually had.' " *Gonzales v. State*, 304 S.W.3d 838, 842 (Tex.Crim.App.2010) (quoting GEORGE E. DIX & ROBERT O. DAWSON, 42 TEX. PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 28.56 (2d ed.2001)). A defendant can ordinarily make such a showing only at a hearing on a motion for new trial because only then will she be able to produce evidence regarding what additional information, evidence, or witnesses the defense would have had avail-

Andrus's home twice. She noted his medications and took his blood pressure, but never asked him about a wheelchair. An insurance agent subsequently visited him and obtained information for an application for a wheelchair, which he received three weeks later.

9. At the time he testified, Ekwere had pleaded guilty in federal court and was awaiting sentencing.

10. Appellant also contends denial of a continuance resulted in ineffective assistance of counsel. Because appellant asserts claims of ineffective assistance related to at least one of her other stated issues, we discuss her claim of ineffective assistance separately.

11. We agree with our dissenting colleague that judges "must be on guard against the tendency to forget what it is like to be in the trenches as a trial attorney," i.e., that judges should temper the exercise of discretion with empathy. Nevertheless, when we review a trial court's ruling for an abuse of discretion,

the standard is not whether we would have decided the matter differently than the trial court. *See State v. Reina*, 218 S.W.3d 247, 250 (Tex.App.-Houston [14th Dist.] 2007, no pet.). Rather, we adhere to the standard that there is no abuse of discretion merely because a trial court decided a matter within its discretionary authority differently than we would have in similar circumstances. *Jensen v. State*, 66 S.W.3d 528, 537 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd).

Also, absent lack of preparation or a complete denial of counsel, we generally do not deem prejudice to an appellant. *See Rosales v. State*, 841 S.W.2d 368, 374–76 (Tex.Crim.App.1992). Thus, even when circumstances may have resulted in counsel's being less prepared than might otherwise have been the case, we still require a showing of prejudice to warrant reversal. *See id.* at 375. Review of the record in the present case shows that counsel was prepared and thoroughly cross-examined every witness, eliciting favorable testimony for his client. He also called seven witnesses in his client's defense.

able if the trial court had granted the motion for delay. *Id.* at 842–43.[12]

At issue is appellant's motion for continuance filed on October 20, 2008, the date set for trial. In her motion, appellant stated her counsel's office was closed from September 11, 2008 until September 30, 2008 because of Hurricane Ike. She alleged that, during that time, counsel had no access to appellant's file and was not able to complete trial preparation or ascertain how much of appellant's file had been damaged. She further alleged that, on September 29, 2008, counsel first learned of additional documents and witnesses the State intended to present. On appeal, she argues the trial court erred in not granting her motion because denial of the motion rendered her counsel ineffective in the following regards: (1) being unable to hire an expert witness, (2) being surprised by new evidence the State intended to present, and (3) having to proceed to trial with a damaged working file.

### 1. Inability to hire an expert

■ By statute, when a defendant bases a motion for continuance on an absent witness, she must show (1) she exercised diligence to procure the witness's attendance; (2) she has not procured, or consented to, the absence of the witness; (3) she is not making the motion for delay; and (4) the facts she expects the witness to prove. Tex.Code Crim. Proc. art. 29.06

(Vernon 2006); *Harrison v. State,* 187 S.W.3d 429, 434 (Tex.Crim.App.2005). A motion for continuance must show on its face the materiality of the absent testimony. *Harrison,* 187 S.W.3d at 434. Although there is no comparable statutory provision governing a pretrial motion for a continuance to secure an expert, lack of such a provision means determination of such a motion is particularly within the trial court's discretion. *Gonzales,* 304 S.W.3d at 843–44.

■ Appellant first raised her inability to hire an expert in her motion for a new trial. Thus, the trial court was not aware of this allegation when it ruled on the motion for continuance. An appellate court will not conclude the trial court abused its discretion on the basis of a theory not presented to it. *See San Jacinto Methodist Hosp. v. Bennett,* 256 S.W.3d 806, 814 n. 13 (Tex.App.-Houston [14th Dist.] 2008, no pet.) (indicating, in context of civil case, that trial court does not abuse its discretion for not considering grounds not presented to it).

Although appellant now, as she did in her motion for new trial, indicates she would have sought the testimony of Dr. Andrew Nelson Avery of the University of Texas Medical Branch in Galveston, there is nothing in the record showing the facts she expected him to prove.[13] The record is

---

12. Appellant's motion for new trial, filed December 4, 2008, was overruled by operation of law. *See* Tex.R.App. P. 21.8. Apart from a statement in her second notice of appeal that the "motion for new trial was presented for consideration/hearing on January 20, 2009," there is nothing in the record to indicate appellant presented the motion to the trial court. If presented January 20, 2009, it was not timely. *See* Tex.R.App. P. 21.6 ("The defendant must present the motion for new trial to the trial court within 10 days of filing it, unless the trial court in its discretion permits it to be presented and heard within 75 days

from the date when the court imposes or suspends sentence in open court."). Appellant, however, does not assign error to the trial court's not having held a hearing or not having ruled on the motion.

13. Appellant stated only the following:

The importance of the expert witnesses is seen in the trial presentation. The State of Texas was able to present at least ten to fifteen physician [sic] who proffered opinion [sic] on a number of subject matters related to the medical profession, Medi-

also devoid of any indication she attempted to secure his presence for the June 2, 2008 trial, for which she announced ready, or that she attempted to secure an expert from somewhere other than Galveston after the hurricane.[14] Appellant also had ten calendar days from the start of trial to seek an expert.

Through skillful cross-examination, appellant's counsel elicited favorable opinions from the treating physicians who testified. First, several doctors admitted that the fact a patient could walk did not disqualify the patient from receiving a power wheelchair. Second, several doctors testified that patients can lie to health care providers in order to obtain care, drugs or an item such as a power wheelchair. Third, several doctors admitted that patients can fool a health care provider. Fourth, the doctors all admitted that medicine is a subjective art and that reasonable health care providers can differ in their assessments of a patient. And fifth, several doctors admitted that there was no requirement that a patient have an existing relationship with a health care provider before that health care provider could properly prescribe a power wheelchair.

Because many of the patients walked into the courtroom and testified in court they did not need or use the power wheelchair they received, appellant's defensive theory was that the patients lied to her to get the wheelchair. A defense expert

could only repeat the opinions the treating physicians had already given. Appellant has not established harm in relation to her inability to obtain an expert. *See Gonzales,* 304 S.W.3d at 843.

**2. The "new" evidence and the lost file.**

■ In her motion for continuance, appellant argued the court should continue the trial because counsel had (1) recently learned about three "new" documents and testimony of an extraneous offense witness the State intended to offer and (2) lost part of his file in the hurricane. Counsel learned of the State's additional evidence on September 29, three weeks before trial.

As the State characterized the documents, they contained information already in appellant's possession, i.e., one month of appellant's bank records, a paper copy of material previously provided on a computer disk to the defense, and a disk listing appellant's activity involving other companies, which had been described in the offense report already in defense counsel's possession. The State did not call the witness at issue until its rebuttal case, more than thirty days after counsel received notice.[15] Appellant has not established harm in relation to the purportedly new evidence.

At the motion hearing, counsel stated he had been able to locate most of the file.[16]

care/Medicaid, and/or medical procedures that only an expert would be able to refute.

14. In her motion for new trial, appellant referred to attachments showing post-hurricane attempts to contact Avery. Those attachments are not part of the appellate record.

15. Because the State did not call the witness in its case-in-chief, it arguably was not required to provide notice of the witness. *See* TEX.R. EVID. 404(b) (regarding admissibility of extraneous offense evidence "provided that upon timely request by the accused in a crimi-

nal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction").

16. At the hearing, counsel stated:

I've been able to locate most of the file because it had been set aside upstairs because it was a current and pending trial file. Some of the file was in the file drawer, which included my theory of the case, as well as my workup with my notes in terms of when I was ready for trial last time.

The trial court permitted counsel to copy whatever he needed from the court's file and indicated it could have helped in some way if it had known of the problem earlier. Appellant has not established harm in relation to the lost file.

Additionally, appellant waited until the day of trial before filing her motion for continuance. By that time, numerous witnesses, including out-of-county physicians, federal prisoners, and numerous persons over sixty-five, had been subpoenaed and were ready to testify. *See Gonzales,* 304 S.W.3d at 843. The case had previously been continued and some of the beneficiaries had already died or were incompetent. A reasonable trial judge could have concluded scheduling and other considerations, as well as fairness to the State, outweighed appellant's interest in delay of the trial. *See id.*

For the preceding reasons, we conclude the trial court did not abuse its discretion in denying appellant's motion for continuance.

## B. Due Process

 " 'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly the reasons presented to the trial judge at the time the request is denied.' "

*Rosales v. State,* 841 S.W.2d 368, 374 (Tex. Crim.App.1992) (quoting *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 849–850, 11 L.Ed.2d 921 (1964)). In the absence of an abuse of discretion, there generally can be no violation of due process. *See Hicks v. Wainwright,* 633 F.2d 1146, 1148 (5th Cir.1981) ("When a denial of a continuance forms a basis of a petition for a writ of habeas corpus, not only must there have been an abuse of discretion, but it must have been so arbitrary and fundamentally unfair that it violates constitutional principles of due process."). Just as the trial court did not abuse its discretion, it did not deny appellant due process.

We overrule appellant's first issue to the extent it is addressed to the trial court's exercise of discretion and appellant's right to due process.

## III. AMENDMENT OF THE INDICTMENT

 In issue two, appellant argues the State proceeded to trial on an indictment that was not properly amended.[17] She characterizes the 2007 indictment as the "original indictment" and appears to argue that the State's "attempts" to add Mark Porter as a complainant, to add Medicare as one of appellant's provider categories, and to change the amount of money misappropriated were ineffective. Her argu-

---

That file, as well as another folder, I located one portion of the file. It was water damaged and we're trying to dry that file out to copy, in addition to the other file I've not been able to locate.

17. Specifically, appellant contends:

The State proceeded to trial on an amended indictment that was not properly amended; all proof associated with the Medicare claim was without effect in that the claims were not properly before the court. Counsel was ineffective for the failure to object, such ineffectiveness was caused by the

court's denial of the motion for continuance.

Appellant's second issue is multifarious. *See Stults v. State,* 23 S.W.3d 198, 205 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd) ("A multifarious point is one that embraces more than one specific ground."). We may disregard and refuse to review multifarious points. *Id.* Nevertheless, to the extent we are able to identify appellant's complaints in her second issue with reasonable certainty, we will consider them. *See id.* We consider the claims of ineffective assistance and insufficient evidence in Parts IV and V, respectively.

ments do not comport with the procedural facts or the law.

The indictment giving rise to the present appeal is not the 2007 indictment, but the 2008 indictment. The 2008 indictment, before any handwritten interlineations, contained allegations that (1) appellant was a Medicaid provider and a Medicare provider and (2) the value of the misappropriated money was over one hundred thousand, but less than two hundred thousand, dollars. Accordingly, there was no need to amend the 2008 indictment to incorporate these allegations.

The 2008 indictment listed Mariana Zolondek and David Duhaime as complainants. In its first motion for leave to amend the indictment, the State requested to add Mark Porter's name to the list of complainants, stating the amended indictment should read: "Marianna Zolondek, Mark Porter and David Duhaime." There is nothing in the record to indicate the trial court granted this amendment.

In its second motion for leave to amend, the State asked to change one of the complainant's names from Marianna Zolondek to Sharon Thompson, stating the amended indictment should read: "Sharon Thompson, Mark Porter and David Duhaime." Thus, although the State, in its request, may have assumed Porter was already listed, the State additionally specified that, as amended, the indictment included Porter as a complainant. By signed order, the trial court found "the motion [was] timely and meritorious and should be granted ... *as specified in the motion.*' " (emphasis added.) Read together, the State's motion and the trial court's order authorized an amendment to include Porter as a complainant. *See Riney v. State,* 28 S.W.3d 561, 565 (Tex.Crim.App.2000) (indicating State's motion and trial judge's granting thereof constitute authorization of eventual amendment of charging instrument pursuant to Texas Code of Criminal Procedure Article 28.10). This amendment was then effected by interlineations on the 2008 indictment, reflecting the deletion of Zolondek and the addition of Thompson and Porter. *See id.* ("Physical interlineation of the original indictment is an acceptable but not the exclusive means of effecting an amendment to the indictment."). The State arraigned appellant on the properly amended 2008 indictment.[18]

██ Appellant also contends she was not properly indicted because the assistant grand jury foreperson, rather than the foreperson, signed the indictment. Lack of the foreperson's signature, however, is not essential to the validity of the indictment. *Id.* at 566; *see Owens v. State,* 540 S.W.2d 324, 325–26 (Tex.Crim.App.1976) (stating failure of grand jury foreman to sign indictment does not vitiate instrument and therefore it is permissible for another grand juror to sign indictment in foreman's stead).

For the preceding reasons we overrule appellant's second issue to the extent appellant is arguing the State proceeded to trial on an improperly amended indictment.

**IV. INEFFECTIVE ASSISTANCE OF COUNSEL**

As part of her first and second issues, appellant contends she received ineffective assistance of counsel.[19] In addition to the

---

18. Although the charge on which appellant was arraigned may differ from the amended indictment in that it does not list Duhaime as a complainant, appellant does not assign error to Duhaime's omission. See note 2 above.

19. Appellant states "the deficiency of counsel is also seen" in issue three, in which she contends the evidence was insufficient as a matter of law to show a Medicaid loss of $200,000. Appellant does not explain how

matters raised in her motion for continuance, she complains that counsel failed to object to the amended indictment and failed to call a medical expert witness to rebut the State's physician witnesses.

■ To prevail on an ineffective assistance of counsel claim, a defendant must prove (1) trial counsel's representation fell below the objective standard of reasonableness (deficient performance) and (2) there is a reasonable probability that, but for counsel's deficiency, the result of the proceeding would have been different (prejudice). *Thompson v. State*, 9 S.W.3d 808, 812 (Tex.Crim.App.1999); *see Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

■ A court need not address both components of the inquiry if a defendant makes an insufficient showing on one. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069. "In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.*, 104 S.Ct. at 2069. Instead, if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, we should do so. *Id.*, 104 S.Ct. at 2069.

As discussed in Part II, above, appellant has not shown harm in relation to counsel's lost file or the September 29 notification of additional evidence. Similarly, she has not met her burden of showing prejudice in relation to these matters.

In Part III, above, we concluded there was no impropriety in amendment of the indictment. Accordingly, counsel was not constitutionally ineffective in failing to object to the amended indictment. *See Ladd v. State*, 3 S.W.3d 547, 565 (Tex.Crim.App. 1999).

■ Finally, as discussed in Part II, above, appellant has not shown how she would have benefited from Dr. Avery's testimony had counsel been given additional time to locate him. "Counsel's failure to call witnesses at the guilt-innocence and punishment stages is irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony." *King v. State*, 649 S.W.2d 42, 44 (Tex.Crim.App.1983).

For the preceding reasons, we overrule appellant's first and second issues to the extent appellant is arguing ineffective assistance of counsel.

## V. SUFFICIENCY OF THE EVIDENCE

### A. Standard of Review

■ In issues three and four, appellant challenges the sufficiency of the evidence to support her conviction.[20] When reviewing the sufficiency of the evidence, we examine all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Williams v. State*, 301 S.W.3d 675, 683–84 (Tex.Crim.App.2009). Five justices of the Texas Court of Criminal Appeals recently concluded this standard is the only standard a reviewing court should apply to determine whether the evidence is sufficient to support each element of a criminal

---

counsel was deficient in relation to issue three.

**20.** In issue three, appellant argues, "The evidence was insufficient as a matter of law; the State failed to prove a two hundred thousand dollars ($200,000.00) Medicaid lost [sic]." In issue four, appellant argues, "The evidence was insufficient to support the jury's finding of conspiracy to commit aggregate theft."

offense the State is required to prove beyond a reasonable doubt. *See Brooks v. State,* 323 S.W.3d 893, 894 (Tex.Crim.App. 2010) (plurality op.); *see also id.* at 915–17 (Cochran, J., concurring).

Although we consider all the evidence presented at trial, we may not reweigh the evidence or substitute our judgment for that of the jury. *See Williams v. State,* 235 S.W.3d 742, 750 (Tex.Crim.App. 2007). The jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony; likewise, it is the exclusive province of the jury to reconcile conflicts in the evidence. *Wesbrook v. State,* 29 S.W.3d 103, 111 (Tex. Crim.App.2000). We consider both direct and circumstantial evidence, and all reasonable inferences that may be drawn from the evidence in making our determination. *Clayton v. State,* 235 S.W.3d 772, 778 (Tex.Crim.App.2007).

## B. Statutory Provisions

The jury found appellant guilty of "engaging in organized criminal activity, namely, aggregate theft of property by a governmental contractor of the value of over one hundred thousand dollars and under two hundred thousand dollars." The jury was instructed, "A person commits an offense of engaging in organized criminal activity if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination, she commits aggregate theft." *See* Tex. Penal Code Ann. § 71.02(a)(1) (Vernon Supp.2009).[21]

A finding of guilt for engaging in organized criminal activity requires (1) an intent to participate in a criminal combination and (2) performance of some act, although not necessarily criminal in itself, in furtherance of the agreement. *Jarnigan v. State,* 57 S.W.3d 76, 87 (Tex.App.-Houston [14th Dist.] 2001, pet. ref'd).[22] "Because direct evidence is rarely available to prove the existence of an agreement, circumstantial evidence is sufficient and is almost always needed." *Id.* The jury may therefore "infer an agreement among a group working on a common project when each person's action is consistent with realizing the common goal." *Id.*

"A person acts intentionally, or with intent, with respect to the nature of [her] conduct or to a result of [her] conduct when it is [her] conscious objective or desire to engage in the conduct or cause the result." Tex. Penal Code Ann. § 6.03(a) (Vernon 2003). A "combination" is "three or more persons who collaborate in carrying on criminal activities, although; (1) participants may not know each other's identity; (2) membership in the combination may change from time to time; and (3) participants may stand in a wholesaler-retailer or other arm's length relationship in illicit distribution operations." *Id.* § 71.01(a). " 'Profits' means 'property

21. The offense allegedly occurred between March 3, 2002, and June 3, 2003. Although the legislature subsequently amended section 71.02(a), it made no substantive changes relevant to the charge in the present case.

22. In *Jarnigan,* the defendant was charged with having committed theft, rather than conspiring to commit theft. *See Jarnigan v. State,* 57 S.W.3d 76, 80 (Tex.App.-Houston [14th Dist.] 2001, pet. ref'd). The case on which *Jarnigan* relies is *Barber v. State,* 764 S.W.2d 232 (Tex.Crim.App.1988). In *Barber,* the defendant was charged with "conspiring to commit" the offense in question. *See id.* at 234. In addition to *Jarnigan,* this court has cited *Barber* for the two requirements in the following cases: *Gonzalez v. State,* 63 S.W.3d 865, 869 (Tex.App.-Houston [14th Dist.] 2001), *aff'd on other grounds,* 117 S.W.3d 831 (Tex.Crim.App.2003), and *Tu v. State,* 61 S.W.3d 38 (Tex.App.-Houston [14th Dist.] 2001, pet. ref'd). Like the present case, neither were "conspiring to commit" cases.

constituting or derived from any proceeds obtained, directly or indirectly, from an offense listed in section 71.02.'" *Id.* § 71.01(c).

Theft is the unlawful appropriation of property done with intent to deprive the owner of the property. *Id.* § 31.03(a) (Vernon Supp.2009). Appropriation is unlawful if it is done without the owner's effective consent. *Id.* § 31.03(b)(1). Consent is not effective if it is induced by deception or coercion. *Id.* § 31.01(3)(A). Deception means, *inter alia*, "creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true." *Id.* § 31.01(1)(A).

" 'Appropriate' means ... to acquire or otherwise exercise control over property other than real property." *Id.* § 31.01(4)(B). "When amounts are obtained in violation ... pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense." *Id.* § 31.09 (Vernon 2003).

## C. Analysis

In issue three, appellant contends the evidence was insufficient "as a matter of law" because the State failed to prove a two-hundred-thousand-dollar Medicaid loss. As part of this issue appellant also argues the evidence of Silver–Hawk's corporate billing was insufficient to establish appellant's participation in a combination with Bibian and Achor and there was no showing appellant was involved with Gottlieb or Herpin. As part of issue four, appellant again refers to the evidence regarding the amount of the loss and the alleged members of the combination. She also contends there was insufficient evidence of intent.

As discussed in Part III, above, the 2008 indictment on which appellant was properly tried contained allegations that (1) appellant was a Medicaid and a Medicare provider and (2) the value of the misappropriated money was over one hundred thousand, but less than two hundred thousand, dollars. Thus the State was required to prove a loss of more than one hundred (not two hundred) thousand dollars and could look to Medicare and Medicaid losses to prove that amount. The State also needed to prove a combination of only three persons, including appellant. *See* Tex. Penal Code Ann. § 71.01(a); *Jahanian v. State,* 145 S.W.3d 346, 350 (Tex.App.-Houston [14th Dist.] 2004, no pet.). With these clarifications, we turn first to the evidence supporting findings of (1) a combination, (2) the amount of loss attributable to the combination, and (3) intent. We then briefly discuss the evidence supporting the defense.

### 1. The Combination of Appellant, Bibian, and Achor

Appellant provides no legal authority to support her argument regarding use of the evidence of Silver–Hawk's billing in relation to Bibian's and Achor's involvement in the combination. *See* Tex.R.App. P. 38.1(i); *Trenholm v. Ratcliff,* 646 S.W.2d 927, 934 (Tex.1983) ("Points of error must be supported by argument and authorities, and if not so supported, the points are waived."). Moreover, there was substantial evidence Bibian and Achor, who were husband and wife, owned, directed, and operated Silver–Hawk. That evidence included the following: a Medicaid Provider Agreement naming Bibian, doing business as Silver–Hawk, as the provider; Bibian's signature as administrator on Silver–Hawk's Medicaid Provider Information Form; Bibian's listing as the person having direct or indirect

ownership interests or controlling interests in Silver–Hawk; Achor's and Bibian's listings as directors and incorporators on Silver–Hawk's Articles of Incorporation; Achor's designation as president on Silver–Hawk's Articles of Incorporation; Achor's and Bibian's listings as officers on Silver–Hawk's Texas Franchise Tax Public Information Report; Achor's signature on Silver–Hawk's lease for its office space; Achor's statement to Porter, during the on-site inspection of Silver–Hawk, that Achor was Silver–Hawk's manager; and Achor's and Bibian's listing as signators on Silver–Hawk's bank accounts.

There was also substantial evidence appellant participated in combination with Achor and Bibian in their Silver–Hawk operation. A Silver–Hawk runner testified she saw appellant answering telephones at Silver–Hawk and Bibian introduced them. Appellant admitted she traveled with Bibian to Palestine, Texas, three times. On three checks Bibian wrote to herself on Silver–Hawk's bank account, she noted "Frances" in the memo line.[23] Appellant deposited large amounts of cash to her bank account shortly after Bibian wrote these checks.[24]

We conclude the evidence was sufficient to support a finding of a combination of appellant, Bibian, and Achor.

**2. Amount of Medicare's and Medicaid's Loss Based Solely on Falsified CMNs Appellant Signed in Combination with Bibian and Achor** [25]

Based on twenty-three CMNs signed by appellant and submitted by Silver–Hawk, Medicare and Medicaid paid over one hundred thousand dollars in claims.[26] They did so without their effective consent because payment was induced by appellant's deception. We turn now to the following evidence supporting the existence of deception resulting in a loss of more than one hundred thousand dollars: testimony and documents delineating Medicare's and Medicaid's requirements for providing power wheelchairs, the factual representations contained in the CMNs appellant signed, medical testimony and medical records regarding the beneficiaries, direct observational evidence of individual beneficiaries' physical conditions, evidence of the circumstances under which appellant signed seventeen of the CMNs, and the undisputed amounts Medicare and Medicaid paid for each of the twenty-three recipients.

23. In this court, appellant refers only to two jury questions to conclude the evidence was insufficient to show three or more persons were acting together. In the first question, the jury inquired whether it was necessary to find appellant acted in combination with all five of the alleged coparticipants, and the court referred the jury to the charge. In the second question, which related to a lesser included offense, the jury inquired whether Bibian was listed as the representative of Silver–Hawk or as an individual, and the court responded she was listed as an individual.

24. The deposits ranged from $970.00 to $4,900.00.

25. Because we conclude the evidence was sufficient to establish the amount of loss based solely on the actions of appellant in combination with Bibian and Achor, we need not address appellant's contention there was insufficient evidence to show appellant acted in combination, or had an agreement, with Gottlieb or Herpin.

26. Silver–Hawk received a total of $150,306.48 based on thirty-two CMNs containing appellant's unique physician identification number. Appellant admits signing CMNs, and had records, for twenty-nine patients. Silver–Hawk received a total of $135,605.36 for equipment for these twenty-nine patients. There is specific evidence appellant falsified information on the CMNs for twenty-three of these twenty-nine patients.

Sharon Thompson, senior policy advisor for the Texas Health and Human Services Commission in the Medicaid CHIP division, testified that, when a beneficiary is covered by both Medicare and Medicaid, the Medicare guidelines control the determination of medical necessity for durable medical equipment. Mark Porter, an employee of Palmetto GBA, a federally-contracted health insurance company administering the Medicare program, testified a Medicare Supplier Manual (Manual) is issued to all Medicare providers. To qualify for a motorized wheelchair under Manual guidelines, a potential recipient must meet all the following criteria: the patient's condition must be such that, without the use of a wheelchair, the patient would otherwise be bed- or chair-confined; a wheelchair must be medically necessary; the patient must be unable to operate a manual wheelchair; and the patient must be capable of safely operating the controls for the power wheelchair. According to Porter, the Manual further provides that "a patient who requires a power wheelchair usually is totally nonambulatory and has severe weakness of the upper extremities due to a neurological or muscular disease or condition."

Porter explained that Section B of the CMN is a tool assisting the Medicare processing system to determine whether or not the patient has a medical necessity for motorized wheelchair. The section contains the following seven questions which the treating physician or someone in that physician's office is to answer:

1. Does the patient require and use a wheelchair to move around in their [sic] residence?

2. Does the patient have quadriplegia, a fixed hip angle, a trunk cast or brace, excessive extensor tone of the trunk muscles or a need to rest in a recumbent position two or more times during the day?

3. Does the patient have a cast, brace or musculoskeletal condition, which prevents 90 degree flexion of the knee, or does the patient have significant edema of the lower extremities that requires an elevating leg rest; or is a reclining back ordered?

4. Does the patient have a need for arm height different than that available using non-adjustable arms?

5. How many hours per day does the patient usually spend in the wheelchair? (1–24) (Round up to the nearest hour)

6. Does the patient have severe weakness of the upper extremities due to a neurologic, muscular, or cardiopulmonary disease/condition?

7. Is the patient unable to operate any type of manual wheelchair?

 The evidence regarding the individual recipients included testimony from the recipients' primary physicians, videos showing recipients in their homes, testimony from the recipient or a family member, and testimony from the investigators describing their interviews with the recipients.[27] Additionally, appellant signed seventeen CMNs in two days for identical equipment for persons appellant saw in groups near Palestine, Texas. We turn now to the evidence for each of the twenty-three recipients.[28]

**27.** As discussed below, the investigators were also asked their opinions about whether certain recipients qualified for a power wheelchair. Appellant challenges the admissibility of this opinion testimony in issue five. In considering the sufficiency of the evidence, however, we may consider this testimony regardless of whether it was properly admitted. See Garcia v. State, 919 S.W.2d 370, 378 (Tex.Crim.App.1994).

**28.** To protect the recipients' privacy, we refer to them by their first names and last initials.

### a. Chloe G.—Medicare's monetary loss: $4,674.26

On Chloe G.'s CMN, signed March 19, 2003, appellant answered questions one, two, six, and seven affirmatively. She stated Chloe usually spent nine hours a day in a wheelchair.

Chloe's physician, Dr. Alan Smith, testified he was familiar with the Medicare and Medicaid guidelines required for powered wheelchairs, including the requirement a patient had to be nonambulatory. Smith testified that, "as a generalization, we're talking about a person who cannot walk, even with a walker, they don't have the strength, for example, in the legs, a person that does not have upper body strength to use a manual wheelchair...." Smith had been Chloe's physician from 1997 until her death in 2007. Smith believed Chloe walked with a cane and "at the end, may have had a walker." Chloe "had some fairly severe osteoarthritis. She complained of arthritic pain. But as far as needing something to assist beyond maybe a cane or walker, no, she did not. That was only toward the end ... in 2006." In Smith's medical opinion, Chloe did not need a wheelchair.

Investigator Richard Bliese testified he interviewed Chloe in her home on September 11, 2006. Chloe was able to walk unassisted. Bliese opined Chloe "was not qualified" for a wheelchair. Chloe was deceased at the time of trial.

### b. Donald H.—Medicare's monetary loss: $4,800.23 [29]

On Donald H.'s CMN, signed December 4, 2002, appellant answered questions one, two, three, six, and seven affirmatively. In response to question five, she stated Donald usually spent nine hours a day in a wheelchair.

Donald's treating physician, Dr. James Baker, testified forty percent or more of his patients are on Medicare and he evaluated four or five patients a month for mobility devices. He described the factors he looked for when evaluating a patient for a power wheelchair, including whether a person's hands or arms are too weak to power a manual wheelchair.

Donald was Baker's patient since 2000. Donald had severe emphysema and a mild heart ailment. After a brief hospitalization in autumn 2002, Donald walked into Baker's office, was not experiencing trouble moving, and was not using a cane or walker. During his hospital stay, Donald had walked outside to smoke cigarettes. Baker disagreed with the answers to questions one, two, three, five, six, and seven on Donald's CMN. Although Donald's condition had deteriorated greatly since then, according to Baker, Donald would not have qualified for a power wheelchair or scooter in 2002.

Bliese interviewed Donald at his home in August 2006 and also talked with Dr. Baker. Bliese observed Donald did not need a wheelchair to move about the residence, but was walking. After talking with Dr. Baker and Donald and making his observations, Bliese concluded Donald did not require a power wheelchair under Medicare guidelines in 2002 to 2003. The jury viewed a video showing Donald sitting in a chair, using a ventilator.

### c. Myrtle H.—Medicare's monetary loss: $4,955.81

On Myrtle H.'s CMN, signed December 4, 2002, appellant answered questions one, two, four, six, and seven affirmatively. In response to question five, she stated Myr-

---

**29.** Bliese testified Medicaid incurred the loss. The documentary evidence, however, shows a Medicare, not a Medicaid, loss.

tle usually spent nine hours a day in a wheelchair.

Myrtle's physician, Dr. Jason Laningham, testified fifty percent of his patients were older and frequently requested wheelchairs. He was familiar with the CMN; and, in nine years, he had prescribed only two to three power wheelchairs.

According to Laningham, Myrtle used a walker. Laningham indicated answers one, five, and seven on Myrtle's CMN were incorrect. He did not disagree with the answers to the remaining questions, but considered some of them subjective. Laningham testified that, if Myrtle wanted a manual wheelchair, she could use one, but he would not have ordered a power wheelchair for her. In his medical opinion there was no medical necessity for Myrtle to have a power wheelchair.

Bliese testified that, after observing and talking with Myrtle and talking with her physician and daughter, he determined questions one, two, five, and seven on Myrtle's CMN were answered falsely. He further opined Myrtle did not qualify for a wheelchair under Medicare guidelines. The jury viewed a video, taken April 22, 2008, showing Myrtle walking with the assistance of a cane as she came out of her residence, down the stairs, and over to the shed where she kept the wheelchair.

#### d. James H.—Medicare's monetary loss: $4,800.23

On James H.'s CMN, signed September 30, 2002, appellant answered questions one, six, and seven affirmatively. In response to question five, she stated James usually spent nine hours a day in a wheelchair.

James's physician, Dr. Martin Caperton, testified that twenty-five to thirty percent of his patients were older or geriatric. He was familiar with the CMN and in twenty-nine years of practice had prescribed power wheelchairs less than five times.

James had been Caperton's patient since 2000. Caperton knew James did not use a wheelchair to move around his residence. The answer to question five was incorrect. Caperton further testified the answers to questions six and seven were also incorrect. Finally, Caperton testified he was "not aware of any medical need for an assisted mobility device" for James.

James testified that two women approached him at his house in Willis in 2002 about getting a power wheelchair. James, who was seventy-five years old, was not using a cane or walker and did not own a wheelchair. The women insisted James should get a wheelchair because it was free and he might need one someday. The women subsequently brought James and two other men to Houston.[30] Reviewing his CMN at trial, James testified he never had a wheelchair, did not spend nine hours a day in one, did not have severe weakness of his upper extremities, and could have used a manual wheel chair if he had needed to.[31]

Bliese interviewed James in September 2006 and also talked with Caperton. Bliese observed James did not need a wheelchair to move around in his house.

#### e. Catalina T.—Medicare's and Medicaid's combined monetary loss: $5,934.54

On Catalina T.'s CMN, signed October 1, 2002, appellant answered questions one,

---

**30.** One of the men was Jessie F. Appellant denied treating him and stated that the CMN for Jessie F. was forged.

**31.** During his testimony, James H. referred to the person in Houston as "he," but also stated it was a long time ago and it was hard to remember.

three, six, and seven affirmatively.[32] In response to question five, she stated Catalina usually spent ten hours a day in a wheelchair.

Catalina's physician, Dr. Carlos Palacios, testified that two-thirds of his patients were sixty-five years old or older. He saw CMNs "very often." When determining whether to prescribe a power wheelchair, a physician needed to consider the benefits and detriments to the patients, as well as safety. He had prescribed only a very small number of motorized wheelchairs in his years of practice.

Catalina was Palacios's patient from 1999 or 2000 until 2005, when she began seeing one of Palacios's associates. Catalina saw Palacios three or four times a year. She came to his office "[w]alking or walking with a walker." Catalina was morbidly obese and had frequent inflammation and fluid accumulation in her legs. Given the poor circulation in her legs, it was best for her to have some physical activity. He disagreed with the answer to questions six and seven. Finally, he opined, "I think a motorized wheelchair was not necessary for her, and I think maybe even a little bit detrimental to her health to encourage [her] to use a wheelchair versus physical activity."

Catalina's daughter-in-law, Oralia T., testified that Catalina used a walker in 2002 and Palacios did not want her to have a power wheelchair because he wanted her to walk. Oralia, however, did want her mother-in-law to have the wheelchair, and E.J., a person associated with Silver–Hawk, took Catalina and Oralia to appellant's office. Appellant spent fifteen minutes with Catalina and checked her heart, but did not ask her any questions. According to Oralia, the answers to questions one, five, and seven on Catalina's CMN were false.

Investigator James Cooper interviewed Catalina and her granddaughter at Catalina's apartment. Cooper observed Catalina was able to walk around the apartment. Cooper also spoke with Palacios. Based on his training, experience and qualifications, his understanding of the Medicare and Medicaid guidelines, and his conversations with Catalina, her granddaughter, and Palacios, Cooper formed an opinion Catalina did not qualify for a motorized wheelchair or scooter.

### f. Robert J.—Medicare's monetary loss: $4,674.26

On Robert J.'s CMN, signed March 19, 2003, appellant answered questions one, two, six, and seven affirmatively. In response to question five, she stated Robert usually spent nine hours a day in a wheelchair. Robert testified that was false.

Robert's physician, Dr. David Thompson, testified that fifty to sixty percent of his patients were older. He was familiar with the CMN and ordered power wheelchairs four to six times a year. He opined that many persons who wanted power wheelchairs did not need them and described how he discourages patients from getting them.

Robert had been Thompson's patient since March 2003. Robert had elevated blood pressure and sinus problems, but no difficulty walking. Reviewing Robert's CMN, Thompson testified the answers to questions one, two, five and six were incorrect. Regarding the answer to question seven, Thompson stated he had never tested Robert for a wheelchair.

Robert testified that, in 2002 or 2003, a friend of his called and told Robert he could get a free wheelchair if he wanted to.

---

**32.** The CMN in Catalina T.'s record did not contain the patient's name or address.

Robert, his wife, and several other people went to the Bethel AME Church in Montalba, where a woman spent two or three minutes with him and checked his blood pressure and heart.[33] The woman did not ask him any questions. According to Robert, everyone at the church was there to get a wheelchair, but all were walking. Robert guessed there were ten people there. A day or so later a different woman asked Robert to come to her house, where he signed several papers. Robert subsequently received a wheelchair.

### g. Valley J.—Medicare's monetary loss: $4,631.42

On Valley J.'s CMN, signed March 19, 2003, appellant answered questions one, two, six, and seven affirmatively. In response to question five, she stated Valley usually spent eight hours a day in a wheelchair.

Valley, who was Robert J.'s wife, testified that, in 2002 or 2003, Jessie Summers came through the neighborhood saying they had free wheelchairs. Valley told Summers she did not need one because she was not disabled. Summers returned, however, and convinced Valley the second time. Valley and her husband then went to the Bethel AME Church, where they met Summers and a man and woman from Houston. Valley estimated there were six or seven other people at the church, including C.W.B. Everyone sat down in the kitchen and a woman checked their blood pressure. No one asked them any questions. Valley subsequently received a wheelchair. Valley testified it would be false if someone said she required a wheelchair to move around the house or that she spent eight hours a day in a wheelchair.

Bliese interviewed Robert and Valley J. in their home in September 2006. Both "were walking fine." Additionally, on both Robert's and Valley's charts appellant checked "Unassisted" for ambulation, a functional status Bliese opined was "inconsistent" with issuance of a power wheelchair under the guidelines.

### h. John W.—Medicare's monetary loss: $4,822.66

On John W.'s CMN, signed April 23, 2003, appellant answered questions one, two, six, and seven affirmatively. In response to question five, she stated John spent eight hours a day in a wheelchair.

John testified he had undergone back and neck surgery in 1994 and used a cane or crutches or walked on his own in 2002 and 2003. A counselor from a group he was attending introduced him to someone from Silver–Hawk. The counselor drove him to a doctor's office in Houston, where he was seen by a "black [woman], with an accent." The examination lasted about two minutes, with the woman testing the amount of pressure resistance in his legs and asking him about his pain. Although someone later told John he had been approved, John never received a wheelchair. John testified that, in April 2003, the answers to questions one, two, five, six, and seven on his CMN would have been false.

Bliese testified he interviewed John at John's residence in April 2008. Bliese observed John was "ambulatory."

### i. Rubie L.—Medicare's monetary loss: $4,720.23

On Rubie L.'s CMN, signed October 18, 2002, appellant answered questions one, six, and seven affirmatively. In response

---

**33.** Robert J. described the three women involved as "American" and could not remember their skin color.

to question five, she stated Rubie spent eight hours a day in a wheelchair.

Rubie had died by the time of trial, but his wife, Ruby, testified. In 2002, two women approached them at their house. They convinced Rubie, but not Ruby, to get a wheelchair, and they next day they drove both Rubie and Ruby to Houston. After they arrived at the office, Rubie was in a separate room for fifteen to twenty minutes. According to Ruby, Rubie walked in and out of the office because he did not have any problems walking. Rubie subsequently received a scooter, which he never used. Ruby testified Rubie never spent any time in a wheelchair of any kind until he became ill in 2007.

Bliese interviewed Ruby in her home and reviewed appellant's file for Rubie. Bliese concluded Rubie was not qualified for a wheelchair.

### j. Jessie B.—Medicare's and Medicaid's combined monetary loss: $5,842.82

On Jessie B.'s CMN, signed March 19, 2003, appellant answered questions one, two, six, and seven affirmatively. In response to question five, she stated Jessie spent nine hours a day in a wheelchair.

The jury saw a video of Jessie. She walked slowly, but unassisted, down the stairs from her mobile home, along the front of her home, and to the side where she kept the wheelchair. In the medical chart prepared by appellant, appellant checked "Unassisted" for ambulation.

Bliese interviewed Jessie in her home in April 2007. He observed she was ambulatory and did not need any assistance walking. After talking with Jessie, observing her during the interview, and reviewing the video, Bliese formed an opinion Jessie was not qualified to receive a wheelchair.

### k. Clarence B.—Medicare's monetary loss: $4,674.26

On Clarence B.'s CMN, signed March 31, 2003, appellant answered questions one, two, four, six, and seven affirmatively. In response to question five, she stated Clarence spent nine hours a day in a wheelchair.

The jury saw a video of Clarence. He walked unassisted in the yard outside his home. In the medical chart prepared by appellant, appellant checked "Cane" for ambulation.

Bliese interviewed Clarence in his home in April 2008. He was ambulatory. It did not appear that he needed a wheelchair or scooter. Bliese formed the opinion Clarence did not require or need a wheelchair under the Medicare guidelines.

### l. Lillie G.—Medicare's monetary loss: $4,674.26

On Lillie G.'s CMN, signed March 31, 2003, appellant answered questions one, two, six, and seven affirmatively. In response to question five, she stated Lillie spent nine hours a day in a wheelchair.

The jury saw a video of Lillie. Using a wheeled walker, she walked slowly from the living room, through the kitchen, to a room where the wheelchair was stored, wrapped in plastic, next to a roll of carpet.

Bliese interviewed Lillie in September 2006. He described Lillie as "elderly, but she was able to still walk around and was not using ... any type of wheelchair." Based on his training and experience, his interview, and his observations, Bliese formed an opinion Lillie was not qualified to receive a wheelchair for which Medicare would pay.

### m. Esther P.—Medicare's monetary loss: $4,674.26

On Esther P.'s CMN, signed March 31, 2003, appellant answered questions one,

two, four, six, and seven affirmatively. In response to question five, she stated Esther spent nine hours a day in a wheelchair.

The jury saw a video of Esther. After walking a short distance inside her home, she used a cane to walk to and around the outside deck.

Bliese interviewed Esther at her residence in April 2008. She was ambulatory and it did not appear to Bliese that she needed a wheelchair. After talking with Esther and making his observations during the interview, Bliese formed the opinion Esther did not qualify for a wheelchair.

### n. Sadie G.—Medicare's and Medicaid's combined monetary loss: $5,842.82

On Sadie G.'s CMN, signed March 31, 2003, appellant answered questions one, two, six, and seven affirmatively. In response to question five, she stated Sadie spent eight hours a day in a wheelchair.

A video of Sadie was admitted into evidence.[34] She walked unassisted from the inside of her house to the porch and told the investigator she never used the wheelchair. The video also showed paperwork indicating Jessie Summers had delivered the chair. In the medical chart, prepared by appellant, appellant checked "Cane" and "Walker" for ambulation.

### o. Other recipients for whom appellant signed CMNs on either March 19 or March 31, 2003.

On March 19, 2003, appellant signed CMNs for nine recipients she had seen at the church in Montalba. On March 31,

2003, she signed CMNs for eight recipients she had seen in Palestine.

On each of these seventeen CMNs, appellant affirmed the patient required and used a wheelchair to move around the residence. Appellant also provided a specific number of hours the patient spent per day in a wheelchair. Dr. Thompson, Robert J.'s regular physician, opined that signing this many CMNs was "excessively high" and "consistent with the patients being fooled."

Robert and Valley J. described the event resulting in the March 19 CMNs. Robert's individual examination lasted two to three minutes and no one asked either of them any questions. Robert observed everyone was walking. Valley J. said C.W.B. was present at this group session.

The seventeen CMNs contained identical content in the sections for the supplier's information and the narrative description of the equipment and cost. Identical flaws appeared on the forms, indicating multiple preprinted copies which were then given to appellant for completion and signature. Appellant admitted when Bibian went to Palestine with her, section C of the CMNs was completed in advance.[35] Appellant thought "the codes were already there and I interpret it as wheelchair that the patient would need."

Thus, regarding the seventeen Montalba and Palestine recipients, there was direct evidence appellant falsified the answers on eight CMNs [36] and circumstantial evidence she falsified answers on the other nine. These other nine CMNs were those for Ola A. (Medicare monetary loss, $4,674.26), Norris B. (Medicare monetary loss,

---

34. In the interest of time, the State did not play this tape, but allowed that, if the jurors wanted to see it later, they could play it.

35. Section C is a narrative description of the equipment being ordered and the cost.

36. These eight CMNs, discussed above, were for Chloe G., Robert J., Valley J., Jessie B., Clarence B., Lillie G., Esther P., and Sadie G.

$4,674.26), C.W.B. (Medicare and Medicaid combined monetary loss, $5,842.82), Jettie J. (Medicare and Medicaid combined monetary loss, $5,842.82), Robert R. (Medicare monetary loss, $4,674.26), Q.B.G. (Medicare monetary loss, $4,594.26), Ollie D. (Medicare monetary loss, $4,606.30), M.M. (Medicare monetary loss, $4,674.26), and Lorine L. (Medicare monetary loss, $4,674.26).

In sum, Medicare and Medicaid reimbursed Bibian and Achor's DME based on twenty-three CMNs, which appellant admitted signing and for which there was evidence they contained falsified information. The total Medicare and Medicaid loss for these CMNs alone was $113,979.56.

We conclude the evidence was sufficient to support a finding of aggregate theft of over one hundred thousand dollars for the twenty-three CMNs detailed above.

### 3. Intent

▮▮▮▮ As part of issue four, appellant appears to argue there was insufficient evidence of intent.[37] There are two parts to the mental state requirement for engaging in organized criminal activity. *Hart v. State*, 89 S.W.3d 61, 63 (Tex.Crim.App. 2002). One mental state requirement is included in the commission of one of the enumerated offenses. *Id.* (citing TEX. PENAL CODE § 71.02(a)). For example, if, as here, the enumerated offense is theft, the State must prove that the appellant intended to deprive the owner of property as part of proving the underlying enumerated offense. *See id.* (citing Tex. Penal Code § 31.03(a)). The other is the defendant's intent to establish, maintain, participate in, or participate in the profits of, a combination. *Id.* The jury may infer the existence

of either mental state from any facts tending to prove its existence, including the acts, words, and conduct of the accused. *Dobbins v. State*, 228 S.W.3d 761, 765 (Tex. App.-Houston [14th Dist.] 2007, pet. dism'd).

As discussed above, there was direct evidence appellant falsified answers on fourteen CMNs and circumstantial evidence she falsified answers on nine more. In some cases, the answer to CMN question one regarding the necessity of a wheelchair directly contradicted information about ambulation contained in appellant's corresponding patient file. From appellant's testimony that she interpreted the pre-printed section C on the CMNs as being the wheelchair the patient would need, a jury could infer she knew she was creating a scenario in which Medicare and Medicaid would reimburse Silver–Hawk for a wheelchair and was thus depriving Medicare and Medicaid of their property.

Appellant testified she knew Bibian would not give the pre-printed CMNs to a company other than Bibian's own. As discussed above, there was circumstantial evidence appellant received cash payments from Bibian. This evidence consisted of three checks Bibian wrote to herself on Silver–Hawk's bank account on which she noted "Frances" in the memo line and cash deposits to appellant's bank account shortly thereafter. From this evidence, a jury could infer appellant intended to participate in the profits of the combination.

We conclude the evidence was sufficient to support a finding of intent.

### 4. Evidence Favoring the Defense

The primary evidence favoring the defense was appellant's own testimony. She denied receiving any money from Bibian,

---

**37.** Although appellant cites legal authority, she provides no record citations to support this argument.

Achor, or any runner and testified she had never worked for Silver–Hawk or been to its location. She explained cash deposits to her bank account as resulting from her jewelry business.

She did home visitations for the Visiting Nurses Association and for MD Healthcare Services. She estimated her clinical assessments lasted at least twenty to thirty minutes. She answered the questions on the CMNs based on her assessment of the potential recipients and did not sign a CMN for everyone she saw. She testified she wanted to improve patients' health by conserving their energy.

Appellant also relied on cross-examination of the State's witnesses. Specifically, she elicited favorable testimony from the treating physicians as outlined in Section II above to support her theory that the patients lied to her and/or it was her medical opinion that the patients needed wheelchairs.

It was, however, for the jury to determine appellant's credibility and the strength of her evidence. *See Fuentes v. State*, 991 S.W.2d 267, 271 (Tex.Crim.App. 1999). We conclude the evidence was sufficient to support appellant's conviction. Accordingly, we overrule appellant's issues three and four.

## VI. OPINION EVIDENCE

In issue five, appellant argues "[t]he trial court erred in allowing non-expert witnesses to proffer their opinions of medical necessity." Specifically, she refers to the testimony of James Cooper and Russell Bliese, who were involved in the Silver–Hawk investigation. Cooper interviewed one recipient for whom appellant allegedly signed the CMN; Bliese interviewed fifteen.[38] Both also interviewed recipients for whom other physicians had written the CMNs. The testimony about which appellant complains consisted of Cooper's and Bliese's opinions the recipients "did not qualify" or were "not qualified" for wheelchairs or power wheelchairs under the Medicare and Medicaid guidelines.[39] Appellant objected to this testimony on the ground Cooper and Bliese were not qualified to offer the opinions because they were not medical doctors.

■ Texas Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex.R. Evid. 702. The expert's knowledge and experience must be "beyond that of an average juror." *Duckett v. State*, 797 S.W.2d 906, 914 (Tex.Crim.App. 1990), *disapproved on other grounds by Cohn v. State*, 849 S.W.2d 817, 819 (Tex. Crim.App.1993). When specialized knowledge will assist the jury to understand the evidence or to determine a fact at issue, the court may allow an expert to provide the jury with the benefit of that knowledge. *Id.*

---

38. In addition to the recipients discussed in Part V.C.2., above, Bliese interviewed Jessie F. and Nimat A. Appellant did not produce a file for Jessie F. and denied signing the CMN. No Medicare or Medicaid loss was attributable to Nimat A.

39. In four instances, Bliese used the phrases "did not require" "did not need," "did not appear to need," and "was not eligible." When asked whether one recipient "need[ed] a wheelchair to get around in his residence," Bliese responded, "No." Bliese also opined, over objection, that it was inconsistent to have checked "unassisted" for ambulation and have issued a power wheelchair.

We apply an abuse-of-discretion standard in reviewing a trial court's determination of a witness's qualifications as an expert and judgment regarding the admission of any expert testimony. *Ellison v. State*, 201 S.W.3d 714, 723 (Tex.Crim.App.2006). Absent a clear abuse of discretion, we will not disturb the trial court's decision to admit or exclude testimony. *Id.* A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Casey v. State*, 215 S.W.3d 870, 879 (Tex.Crim.App. 2007).

Cooper was a former five-year employee of the Texas Attorney General's Medicaid Fraud Control Unit and a current investigator of fraud abuse in the Medicare system. He investigated Silver–Hawk and had worked on hundreds of investigations involving Medicare or Medicaid fraud. As part of his work, he often received training from the medical review staff, who are nurses, regarding the regulations he had to review and audit. He testified it was true that, under the Medicare guidelines contained in the 2002–2003 Medicare Supplier Manual, a patient who requires a motor wheelchair usually is totally nonambulatory and has severe weakness of the upper extremities due to a neurologic or muscular disease or condition. Based on his training, experience and qualifications, his understanding of the Medicare/Medicaid guidelines for qualifying someone for a wheelchair or scooter, and after conversations with Catalina T.'s daughter-in-law, granddaughter, and physician, he formed the opinion Catalina did not qualify for a motorized wheelchair or scooter. Although Cooper gave similar opinions about other recipients, none of them were persons for whom appellant had signed CMNs.

Bliese succeeded Cooper in the Attorney General's investigation of Silver–Hawk. Bliese was familiar with the standards for issuance of a wheelchair under the Medicare guidelines and read to the jury the requirement that a patient usually be totally nonambulatory and have severe weakness of the upper extremities. During interviews, Bliese observed the recipients to see whether they could walk and observed the homes to see whether they could accommodate a wheelchair. He also talked with the recipient and sometimes with his or her physician. He opined Chloe G., Myrtle H., Rubie L., Jessie B., Lillie G., and Esther P. did not qualify for a wheelchair under Medicare guidelines; Donald H. did not require a power wheelchair; James H. did not need a wheelchair to move around in his house; and Clarence B. did not require or need a wheelchair under Medicare guidelines.[40] He also concluded appellant's having checked "unassisted" under ambulation for Valley J. and Robert J. was inconsistent with her having authorized a power wheelchair.

In sum, neither Cooper nor Bliese gave an opinion regarding the "medical necessity" of a wheelchair or a power wheelchair.[41] Instead, based on their knowledge of, and experience interpreting, Medicare guidelines, they opined recipients did not qualify, or were not eligible, for wheelchairs. *See United States v. Davis*, 471 F.3d 783, 788–89 (7th Cir.2006) (in prosecution for defrauding Indiana Medicaid, holding admissible testimony of Indiana

40. Bliese also opined Darnell D. was "not eligible" for a wheelchair. Appellant did not sign Darnell's CMN.

41. Appellant relies on *Calvo v. State*, No. 02–05–00107–CR, 2006 WL 1174211 (Tex.App.-Fort Worth Sept. 13, 2006, pet. ref'd) (mem. op.) (not designated for publication). As an unpublished criminal case, it is without precedential value. Tex.R.App. P. 47.7(a).

Medicaid employee who was expert in reimbursement for mental health services regarding how Indiana Medicaid interpreted rule governing Medicaid reimbursement for outpatient mental health services provided by psychologist endorsed as health service provider in psychology); *United States v. Gold,* 743 F.2d 800, 816–17 (11th Cir.1984) (holding chief and agent qualified as expert witnesses on subject of scope of Medicare coverage for prosthetic eyewear when (1) chief of health care financing agency's coverage and eligibility policy section had been working in Medicare for nine years and (2) health and human services special agent had received special training concerning Medicare and was three-year veteran of office of investigations in inspector general's office of health and human services). We conclude the trial court did not abuse its discretion in allowing Cooper and Bliese to testify about whether recipients qualified for a wheelchair under Medicare guidelines.

 Nevertheless, even if the trial court abused its discretion, any resulting error did not affect appellant's substantial rights. *See* Tex.R.App. P. 44.2(b) (stating any nonconstitutional "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded"). We will conclude erroneous admission of evidence did not affect substantial rights if, after examining the record as a whole, we have fair assurance the error did not influence the jury or had only a slight effect. *Motilla v. State,* 78 S.W.3d 352, 355 (Tex. Crim.App.2002). In assessing the likelihood the jury's decision was adversely affected by the error, we should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of

the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case. *Id.* We may also consider the jury instructions, the State's theory, any defensive theories, and whether the State emphasized the error. *See id.*

 For all of the recipients discussed in Part V.C.2, above, about whom Cooper or Bliese expressed an opinion, the jurors heard testimony from the recipient, a family member, or the recipient's physician, or the jury saw a video of the recipient.[42] The jurors also heard evidence about Medicare's and Medicaid's requirements for a power wheelchair. The court instructed the jurors they were "the exclusive judges of the facts proved, of the credibility of the witnesses and the weight to be given their testimony."

In closing argument, the state referred to the treating physicians as "experts," and argued that "you've heard the testimony of·these doctors. None of these wheelchairs were medically necessary." The State, however, never mentioned Cooper or Bliese in closing.

Even if one assumes admission of Cooper's and Bliese's opinions was error, admission of the evidence did not affect appellant's substantial rights and does not warrant reversal. For the preceding reasons, we overrule appellant's fifth issue.

## VII. CONCLUSION

Having overruled appellant's five issues, we affirm the judgment.

MARGARET GARNER MIRABAL,

---

42. This statement is also true for all but four of the total number of recipients about whom Cooper and Bliese gave opinions. The CMNs for these four exceptions were signed by Drs. Kushwaha and Gottlieb.

Senior Justice *, dissenting.

In my opinion, the trial court committed reversible error when it denied appellant's motion for continuance, and therefore we should sustain appellant's first issue. Accordingly, I respectfully dissent.

Following are some reported facts about Hurricane Ike:

> Hurricane Ike ... was the third costliest hurricane ever to make landfall in the United States Ike made its final landfall near Galveston, Texas as a strong Category 2 hurricane, with Category 5 equivalent storm surge, on September 13, 2008, at 2:10 a.m. CDT....
>
> ... Damages from Ike in U.S. coastal and inland areas are estimated at $29.6 billion.... The hurricane also resulted in the largest evacuation of Texans in that state's history. It became the largest search-and-rescue operation in U.S. history.

HURRICANE IKE, http://www.en.wikipedia. org/wiki/Hurricane—Ike (last visited October 19, 2010) (footnotes omitted); see also HURRICANE IKE FAST FACTS (updated Dec. 2, 2008), http://www.HoustonHurricane Recovery.org/node/163.

> The storm roared ashore hours before daybreak Saturday with 110–mph winds and towering waves, smashing houses, flooding thousands of homes, blowing out windows in Houston's skyscrapers, and cutting off power to more than 3 million people, perhaps for weeks.
>
> ....
>
> **Storm surge topped out at 15 feet**
>
> Because Ike was so huge—some 500 miles across, making it nearly as big as Texas itself—hurricane winds pounded the coast for hours before and after the storm's center came ashore.

CREWS FAN OUT TO SEARCH FOR IKE VICTIMS, (Sept. 14, 2008, updated 2:03 a.m. ET), http://www.MSNBC.MSN.com/id/ 26637482/.

In the present case, the following facts are set forth in appellant's sworn motion for continuance.

Appellant's attorney's law office was on Galveston Island. On September 11, 2008, he closed his office because of Galveston's mandatory evacuation order in advance of the September 13, 2008 landfall of Hurricane Ike. After Ike hit, Galveston Island was closed and appellant's counsel was unable to get back to his office for many days. It was only after appellant's counsel prevailed in a lawsuit against Galveston that he was able to gain access to the island and his office.[1]

On return, appellant's counsel found that his office had been flooded with four feet of water. Counsel's office equipment, including computers, sustained water damage. One-third to one-half of his client files, for approximately 250 clients, were water damaged. In addition, the warehouse where counsel stored many files was inundated with ten to twelve feet of water, resulting in a total loss of most of those files. Attached to the sworn motion for continuance are pictures of the damage caused by Ike to counsel's office and warehouse.

Appellant's counsel's office had no electricity for seventeen days, until September 29, 2008. When counsel gained access to his office, he began the herculean task of assessing his damages, including losses to his client files, and cleaning up. During

---

\* Senior Justice Margaret Garner Mirabal sitting by assignment.

**1.** *See Anthony P. Griffin, et al. v. Mayor Lyda Ann Thomas, City Manager Steven Le Blanc,* *City of Galveston;* In the United States District Court for the Southern District of Texas; Civil Action No. H–08–2801, filed on September 19, 2008.

the time counsel was excluded from his office with no access to his files or scheduling orders, many deadlines had passed, hearings were held, and orders were entered in cases he was handling; he therefore devoted his law practice first to those matters that he missed due to his absence, as well as to other client matters that were of an emergency nature. In addition to his office, counsel had his home on Galveston Island to worry about. He did not move back into his home until October 18, 2008, just two days before the trial in the present case.

Appellant's sworn motion for continuance of the October 20, 2008 trial additionally states the following:

> Counsel was simply not able to complete the process of preparing for trial in this matter and has not been able to determine whether the file survived in toto. . . .
>
> . . . Counsel has also determined that his working folder/trial preparation/theory of case folder was damaged. . . . Counsel is still culling damaged materials to determine whether there are other parts of the client's file that were compromised.
>
> . . . .
>
> . . . Because of the circumstances described in this motion, counsel has been incapable of completing the preparation for trial and cannot currently proceed to trial for a two week period. . . .
>
> . . . .
>
> . . . This case is a complex criminal matter. . . . The State has made clear that it intends to call at least twenty physicians and a review of the file reveals that multiple medical files will be used to establish the State's case. . . .
>
> . . . Without a sufficient period of time between the storm and trial, counsel would be performing a disservice to the client and this Court.

The State's attorney had spoken with appellant's attorney by phone on September 29, 2008, and had learned that Hurricane Ike had caused flood damage to the office. Appellant's attorney faxed the motion for continuance to the State's attorney on Thursday, October 16, 2008; the State's attorney stated she opposed the motion for continuance. On Friday, October 17, the State's attorney showed a copy, albeit incomplete, of appellant's motion for continuance to the trial judge. Even though the motion for continuance was not officially filed with the court until the day of trial, Monday, October 20, the court and the State's attorney had both seen a copy of the motion for continuance in advance.

A hearing was held on the motion for continuance on Monday, October 20. After describing to the court the severe damage he had incurred from Hurricane Ike, appellant's counsel explained that for the past three weeks, since his office was open again, he had been cleaning up and getting his office organized, and he had been essentially practicing emergency law, taking care of everything that was amiss as a result of his long, unplanned absence from his office, such as missed deadlines, missed appearances, and orders entered during his absence. Appellant's counsel pleaded:

> I recognize this Court told us in the last setting that there would be no continuances, but I did not plan Ike and no one in the Galveston community planned for a hurricane.
>
> I ask the Court to continue this matter so that justice can be done. It is literally impossible for me to go to trial this morning without all of my file intact. I spent most of this weekend trying to locate the remaining portions of the file and have not been able to do so.
>
> . . . .

I cannot, in good faith, cannot hold out to the Court that I'm effective as from the Sixth Amendment standpoint. I think it denies my client her due process rights. She's entitled to effective assistance of counsel.

The trial court denied appellant's motion for continuance. The jury trial lasted more than two weeks. Appellant was convicted.

In her first issue, appellant asserts the trial court erred in denying her motion for continuance. In my opinion, the trial court abused its discretion when it denied the motion.

A criminal action may be continued on the written motion of the State or of the defendant, upon sufficient cause shown, which shall be fully set forth in the motion. Tex.Code Crim. Proc. art. 29.03. When denial of a continuance has resulted in representation by counsel who was not prepared, the appellate courts have not hesitated to declare an abuse of discretion. *See Heiselbetz v. State,* 906 S.W.2d 500, 511 (Tex.Crim.App.1995). To find an abuse of discretion in refusing to grant a motion for continuance, there must be a showing that the defendant was prejudiced by her counsel's inadequate preparation time. *See id.*

Appellant's counsel was clearly not prepared to proceed to trial in this very complex criminal case.[2] Not only were key parts of his case file missing or damaged, including his trial preparation/theory of case folder, but counsel simply had not had the opportunity to focus on and prepare for this trial. As judges, the longer we wear our black robes, we must be on guard against the tendency to forget what it is like to be in the trenches as a trial attorney. Counsel's office was flooded with four feet of water and his warehouse was inundated with ten to twelve feet of water, his files and equipment were submerged, he was banned from his office and case files for a lengthy period of time, his home was not habitable. The present case was set for trial a mere three weeks after counsel's power was restored to his office. Understandably, during those three weeks, counsel's focus was on cleaning up his office, drying out his files, repairing/replacing equipment, finding files, handling clients' immediate needs, and dealing with missed deadlines and orders entered in his absence—he was putting out fires. And counsel's damaged home required attention. Faced with such nightmare circumstances, there is no doubt that appellant's counsel was totally credible in his representations to the court that he was not prepared to proceed with the defense of his client in this complex case, and he needed a continuance in the interest of justice. Prejudice to appellant under these circumstances can and should be deemed.

According to the U.S. Supreme Court,

The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in

---

2. The jury trial lasted from October 20 to November 5, more than two weeks. In the guilt-innocence phase, the State called thirty-nine witnesses, including thirteen medical doctors. The defense called seven witnesses.

every case, particularly in the reasons presented to the trial judge at the time the request is denied.

*Ungar v. Sarafite,* 376 U.S. 575, 589–90, 84 S.Ct. 841, 849–50, 11 L.Ed.2d 921 (1964) (citations omitted).

The Texas Supreme Court recognized the devastating effect that Hurricane Ike had on the legal community when it issued its September 17, 2008 Emergency Order Number 08–9140 and Opinion, stating:

> This past weekend, Texas was struck by Hurricane Ike, resulting in the closure or inaccessibility of court clerks' offices and lawyers' offices. The resulting exigencies should be considered in enlarging time periods prescribed by the Texas Rules of Civil Procedure and the Texas Rules of Appellate Procedure.
>
> . . . .
>
> ... To provide clarity to the judiciary and to the bar in this difficult period in the aftermath of a natural disaster, the Court orders that the closure of a court clerk's office is "good cause" for enlarging the time of filing any document within the meaning of Rule 5, Tex.R. Civ. P., and ... [o]f course, there may be other good cause for an enlargement of time, including the dislocation of counsel....
>
> . . . .
>
> This Order is issued in response to a natural disaster and is temporary. It expires October 31, 2008, unless extended by further Order of the Court.

In the spirit of this Texas Supreme Court Emergency Order and Opinion, the trial court in the present case should have considered the exigencies resulting from the closing of appellant's counsel's office and the damage caused by Hurricane Ike, not only with regard to the timing of the filing of the motion for continuance, but also with regard to the merits of the motion. Hurricane Ike and its aftermath presented extraordinary circumstances. The trial court abused its discretion in this matter.

I would sustain appellant's first issue, reverse the judgment, and remand this case for a new trial.