**Affirmed and Memorandum Opinion filed September 27, 2012.**



**In The**

# Fourteenth Court of Appeals

### NO. 14-11-00421-CR

**ROBERT LYLES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 176th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1261026**

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant, Robert Lyles, of "engaging in organized criminal activity." In four issues, appellant contends the evidence is legally insufficient to support his conviction and the trial court erred by refusing to quash the jury panel, overruling appellant's objection to jury argument, and permitting the State to present a certain punishment enhancement. We affirm.

## I. BACKGROUND

During 2010, several law enforcement agencies cooperated in a multi-jurisdictional investigation regarding persons allegedly involved in identity theft and fraud. The suspects were purportedly creating counterfeit identification cards ("ID cards") and checks. Officers possessed information that appellant was the person producing the counterfeit items and other persons were working with appellant.

Officers conducted surveillance of appellant's house. Leslie Clark and Detraicia Pineda also lived at the house and were financially supported by appellant. Clark was previously convicted of numerous offenses, including drug possession, credit card abuse, and shoplifting. She had recently discontinued a drug-abuse recovery program and was working for a women's prison-recovery organization. Pineda had a prior felony conviction for identity theft and was on probation in another identity-theft case.

According to officers, "almost every day," appellant and Pineda went to an apartment located five miles away on Wagonwheel Lane (the "Wagonwheel Apartment"), where they would remain for four to five hours; they never spent the night at the apartment. The Wagonwheel Apartment was leased to Pineda, and she listed appellant as her emergency contact and employer.[1] As described below, officers eventually searched the Wagonwheel Apartment and found a massive amount of check-fraud contraband.

On April 7, 2010, officers observed two females, specifically, Shamanda Jeffery and another woman, park their car in the driveway of appellant's house and meet briefly with appellant. Officers later found a photograph of Jeffery in the Wagonwheel Apartment.

On April 9, 2010, officers observed two different females, specifically, Jana Williams and "unknown black female,"[2] park in appellant's driveway, meet with

_____

[1] Pineda testified appellant was her partner in an income-tax-preparation business.

[2] During their surveillance, officers observed appellant interact with several black females whose

2

appellant briefly in his garage, then leave.  As discussed in detail below, the females proceeded directly to a Target retail store where they jointly committed money laundering.

On April 12, 2010, officers observed appellant drive an unusual route to a side street, where he pulled beside another car and handed something to its driver.  There is no evidence regarding the identity of the other driver, and no description of the object appellant handed the driver.

On April 20, 2010, officers followed appellant to Lisa Allen's house.  Allen exited the house and spoke with appellant while he remained inside his car.  The next day, appellant drove to a restaurant parking lot and pulled alongside a car driven by Allen.  Officers saw appellant hand Allen a folded envelope.  Officers never determined what the envelope contained; however, officers later found a photograph of Allen in the Wagonwheel Apartment.

During the evening of April 20, 2010, officers observed Lee Tate, Jr. and Gladys Jack park in appellant's driveway.  Tate walked to appellant's front door but was directed to enter the garage.  After a few minutes, Tate and Jack left.  Shortly thereafter, officers stopped Jack for a traffic violation.  Inside Tate's wallet, officers found a valid IRS check written to Goree Sears but with Tate's mailing address.  When officers later searched the Wagonwheel Apartment, they did not find any evidence pertaining to Tate or Sears.

Officers eventually obtained an arrest warrant for Pineda.  On April 28, 2010, officers executed the warrant while Pineda and appellant were inside the Wagonwheel Apartment.  Officers introduced themselves then forcibly entered the apartment.  Inside, Pineda and appellant were already lying on the floor, apparently anticipating arrest.  Officers found a vast amount of check-fraud contraband, including computers with check- and ID card-creating software, a printer and laminator, check stock, printouts of

---

identities were never discovered.  In the indictment and jury charge, these females were referred to by the singular term "unknown black female."  Similarly, several unidentified black males were involved in appellant's scheme and were referred to in the indictment and jury charge by the singular term "unknown black male."

3

numerous individual's identifying information, stolen checks or copies of checks, and passport-sized photographs of individuals which apparently would be used to create counterfeit ID cards. Officers discovered packets in which individuals' identifying information had been stapled to stacks of counterfeit checks bearing the individuals' names. In the bathroom, officers observed several passport photographs on the sink and floor; Pineda testified appellant proceeded to the bathroom when the officers first arrived and introduced themselves. Officers also found a bedroom and closet full of women's clothing with the sales tags still attached.

Appellant was indicted for "engaging in organized criminal activity." A jury found appellant guilty and, after finding two enhancements offenses true, sentenced him to life imprisonment.

## II. LEGAL SUFFICIENCY

In his first issue, appellant contends the evidence is legally insufficient to support his conviction of "engaging in organized criminal activity."

### A. Standard of Review

When reviewing sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational fact finder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). We do not sit as a thirteenth juror and may not substitute our judgment for that of the fact finder by re-evaluating weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Rather, we defer to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* This standard applies equally to both circumstantial and direct evidence. *Id.* Our duty as reviewing court is to ensure the evidence presented actually supports a conclusion that the defendant committed the

crime. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

Circumstantial evidence is as probative as direct evidence in establishing guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). An inference is a conclusion reached by considering other facts and deducing a logical consequence from them. *Id.* at 16. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. *Id.* A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt. *Id.* Each fact need not point directly and independently to the appellant's guilt, as long as the cumulative effect of all incriminating facts is sufficient to support the conviction. *Id.* at 13.

## B.  Analysis

Appellant contends there is no evidence supporting a finding that he intentionally committed the offense of "engaging in organized criminal activity." Relevant to our analysis and disposition, a person commits "engaging in organized criminal activity" if, *with the intent* to establish, maintain, or participate in a combination or in the profits of a combination, he commits a felony offense under chapter 32 of the Penal Code. Tex. Penal Code Ann. § 71.02(a)(8) (West Supp. 2012) (emphasis added). A person commits a felony offense under chapter 32 if he, with intent to harm or defraud another, possesses a certain number of items of identifying information of other persons without their consent. *Id.* § 32.51(b), (c) (West Supp. 2012) ("Fraudulent Use or Possession of Identifying Information").

We liberally construe appellant's argument as an assertion that there is no evidence supporting a finding he *intended* "to establish, maintain, participate in, or participate in the profits of a combination." *Hart v. State*, 89 S.W.3d 61, 63–64 (Tex. Crim. App. 2002).[3] This intent may be established by circumstantial evidence. *Id.* at 64;

_____

[3] The other mental-state requirement of "engaging in organized criminal activity" is the mens rea of the underlying felony—here, that appellant, with "intent to harm or defraud," possessed certain

5

*Nwosoucha v. State*, 325 S.W.3d 816, 841 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). "Combination" means three or more persons who collaborate in carrying on criminal activities, even though participants may not know each other's identity and membership in the combination may change from time to time. Tex. Penal Code Ann. § 71.01(a) (West 2011). "Collaborate in carrying on criminal activities" has been defined as intent "to work together in a continuing course of criminal activities." *Nguyen v. State*, 1 S.W.3d 694, 697 (Tex. Crim. App. 1999). It is permissible to infer an agreement among a group working on a common project when each person's action is consistent with realizing the common goal. *Arredondo v. State*, 270 S.W.3d 676, 682 (Tex. App.—Eastland 2008, no pet.).

The trial court instructed members of the jury to find appellant guilty of "engaging in organized criminal activity" if they found beyond a reasonable doubt that:

> [Appellant] . . . did then and there unlawfully, with intent to establish, maintain or participate in a combination or in the profits of a combination, said combination consisting or [appellant] and at least two of the following people, Detraicia Pineda[,] and/or Lee Tate Jr., and/or [Shalonda] Palmer, and/or Leslie Clark, and/or Shamanda Jeffery, and/or Jana Williams, and/or an unknown black female, and/or an unknown black male, and/or Lisa Allen, and/or Dowell Evans, commit the offense of fraudulent use or possession of identifying information[.]

We will first consider appellant's intentions regarding the two women who visited his house during the morning of April 9, 2010, namely, Jana Williams and "unknown black female." We start with contextual facts. On April 8, 2010, an unidentified black male ("unknown black male no. 1") purchased two $100 gift cards from a Target on Westheimer Parkway. He paid for the gift cards using a fraudulent check drawn from an account belonging to John and Maria Mannion; someone had forged John's signature on the check.[4] When officers searched the Wagonwheel Apartment, they found a printout

---

identifying information. *See* Tex. Penal Code Ann. § 32.51(b); *see also Hart*, 89 S.W.3d at 63 (discussing the two, separate intent requirements of "engaging in organized criminal activity"). We do not interpret appellant to have challenged the sufficiency of evidence supporting this intent element.

[4] John testified the check was counterfeit.

containing the name, birth date, address, and driver's license number of Maria Mannion, John's wife. An officer testified that the printout came from a subscription website that provides individuals' identifying information. The officer also testified that the website provides access to the identifying information of every registered person living at an individual's address. Thus, the jury could infer appellant had access to John's identifying information because appellant retrieved Maria's information on the website. These facts also support a reasonable inference that "unknown black male no. 1" received the fraudulent Mannion check from appellant (or someone working with appellant), purchased the gift cards using the check, then delivered the gift cards to appellant (or someone working with appellant).

On April 9, 2010, Williams and "unknown black female" parked their car in the driveway of appellant's house, exited, entered the garage, and met with appellant. After a few minutes, the women returned to their car and drove directly to a Target on FM 1960. The women entered the store and proceeded to the electronics section. "Unknown black female" attempted to purchase a camera using one of the $100 gift cards purchased by "unknown black male no. 1." She had the transaction voided when she was told the camera cost $130. "Unknown black female" and Williams went to the linen section, where each woman selected a comforter set. They then proceeded to different checkouts. "Unknown black female" presented her cashier with an $80 comforter set, trash bags, and two candy bars for a total purchase price of $97.23. She then added a soft drink to her purchase for a total purchase price of $98.73. She paid for the items with the same $100 gift card and exited the store with the merchandise.

Williams carried a $90 comforter set and various snack foods to another cashier. The total purchase price of these items was $101.42. Williams then added a household cleaning product for a total purchase price of $104.54. Williams paid for the items with the other $100 gift card purchased by "unknown black male no. 1." Williams immediately proceeded to customer service and returned the comforter set and cleaning product. In exchange for these items and $.65 cash, Williams received a new $100 gift

7

card. Williams then exited the store, and she and "unknown black female" left in their car. Officers attempted to follow the women but lost sight of them in traffic.

On April 12, 2010, another unidentified black male ("unknown black male no. 2") used the new $100 gift card to purchase $83.44 worth of cologne at a different Target. "Unknown black male no. 2" then immediately returned to the merchandise area of the store, selected a personal hygiene item, and purchased the item for $17.31. He paid for the item with the remaining balance on the gift card and cash. Officers testified they did not know how "unknown black man no. 2" obtained possession of the new gift card.

The foregoing facts support the following findings:

- The gifts cards used by the women were purchased by a fraudulent check created by appellant: (1) the gift cards were purchased with a check bearing the forged signature of John and drawn off John and Maria's account; (2) a website printout containing Maria's identifying information was found in the Wagonwheel Apartment, and John's information would have been accessible on the website because he lived with Maria; and (3) after leaving appellant's house, the women immediately used the gift cards at Target.

- Appellant trusted the women because he met them at his personal residence.

- Both women operated in a highly synchronized fashion when purchasing the items at Target because they (1) proceeded to different checkouts, (2) presented approximately $100 worth of items, (3) and, after receiving the original total price, added an item to their respective purchases. These actions indicate a coordinated plan between the women regarding how to use the gift cards. An officer testified that, based on his training and experience, when two individuals are jointly engaged in retail fraud, they will use separate checkouts because "it's hard, difficult for anybody who's investigating fraud in the store loss prevention to watch two different registers at once."

- "Unknown black male no. 2" engaged in similar behavior on April 12 when he used the new gift card to purchase items in two immediate, consecutive transactions. This fact is evidence of a common understanding among these individuals regarding use of fraudulent gift cards.

- Williams committed money laundering because she ultimately left the Target without making a purchase (except five dollars worth of snack food) but with a new gift card which was used by another person three days later. An officer testified that it is common for criminals engaged in check fraud to purchase gift cards, buy items using the gift cards, then return these items in exchange for new

8

gift cards. This scheme makes it more difficult to trace the new gift cards back to the original fraudulent check.

- "Unknown black female" knew Williams planned to exchange her purchased items for a new gift card because "unknown black female" went to a separate checkout, left the store by herself, and waited for Williams, who returned to the car without a comforter set. Thus, Williams and "unknown black female" worked together to commit money laundering.

- The fact Williams and "unknown black female" engaged in money laundering establishes that they knew appellant had provided them with fraudulent gift cards. This evidence also supports an inference that they knowingly assisted appellant by furthering his scheme.

We recognize that no evidence supports a finding that, prior to April 9, 2010, Williams or "unknown black female" used fraudulent gift cards supplied by appellant or worked with appellant in any criminal activities. However, there is overwhelming evidence that appellant was the architect behind a massive check-fraud scheme that involved sophisticated counterfeiting equipment and many individuals (including persons who directly assisted appellant and those who simply bought counterfeit-check packets from him). Part of appellant's scheme involved using counterfeit checks to purchase gift cards. On April 28, 2010, appellant was in possession of the indentifying information of dozens of individuals. The evidence supports an inference appellant planned to use this information to create counterfeit checks and ID cards which would, in part, be used to purchase gift cards.[5] The actions of Williams and "unknown black female" demonstrate that part of the scheme was to use gift cards to obtain new gift cards in order to attenuate the connection between the gift cards and the fraudulent checks.

Because Williams and "unknown black female" assisted appellant by committing money laundering on April 9, 2010, the jury could have logically inferred appellant intended for Williams and "unknown black female" to provide similar assistance in the future. This is particularly true because it is reasonable to assume appellant intended for

---

[5] There is also evidence supporting a finding that Pineda purchased items using gifts cards. Officers observed Pineda attempt to use a gift card at a retailer, but the gift card had been deactivated. Further, as noted above, officers found in the apartment a vast amount of women's clothing with the tags still attached.

only a small number of individuals to be involved in the money laundering—the more individuals involved in such a scheme, the more likely it was for something to go wrong or for police to become involved. Instead, the jury could have inferred appellant wanted continued assistance from individuals he trusted, who knew how to launder gift cards, and who had done so for him in the past, such as Williams and "unknown black female." Accordingly, we hold the evidence is legally sufficient to support a finding beyond a reasonable doubt that appellant committed the underlying felony with the intent of establishing a combination with Williams and "unknown black female."[6] We overrule appellant's first issue.

### III. MOTION TO QUASH VENIRE PANEL

In his second issue, appellant contends that the trial court erred by denying his motion to quash the venire panel. Specifically, appellant contends the venire panel was tainted because panel members discussed the case during their lunch break, depriving appellant of a fair and impartial jury. We review the trial court's denial of a motion to quash a venire panel for abuse of discretion. *Mendoza v. State*, 552 S.W.2d 444, 447 (Tex. Crim. App. 1977).

During voir dire, the following exchange occurred at the bench:

[Trial Court:] Juror No. 28, would you please come up. . . . I wanted to call you up because I realize, I believe it was when you were talking with [defense counsel], I think I heard a lot of things like I hope that I can be fair or I'll probably be fair.

[Venireman 28:] Yes.

[Trial Court:] And I just have to know, will you be fair?

[Venireman 28:] Oh, absolutely. And I'm just saying, until I hear what's going on I don't know anything about what's happened. And I heard some stuff in the lunch room, and I thought, but I don't know anything about it. Absolutely be fair.

---

[6] Because we conclude the evidence is sufficient to support a finding appellant intended to establish a combination with Jana Williams and "unknown black female," we need not consider whether the evidence supports a finding that appellant intended to establish, maintain, or participate in a combination with anyone else named in the jury charge.

[Trial Court:] All right.

[Venireman 28:] Yeah.

[Trial Court:] Would you like --

[Defense Counsel:] What did you hear in the lunch room?

[Venireman 28:] Just that there'd been this big ring of fraudulent things going on and being in the newspaper and I thought, well, I keep up on everything, you know, I have been able --

[Trial Court:] Time out. I'm sorry, I didn't hear a word she said, obviously. Did she say at lunch something happened? I'm sorry, I didn't hear that part. Who were you talking to at lunch?

[Venireman 28:] Two ladies that were sitting there. I never met them before. I don't know who they are. I don't know their names.

[Defense Counsel:] Are they on this panel with you?

[Venireman 28:] Yes.

[Trial Court:] See, I'm perplexed myself, because I don't recall there really being any publicity, although some people have said this, they must have -- I don't understand what they're talking about. So based upon what you were discussing at lunch, understanding that probably that's all about 99.9 percent wrong.

[Venireman 28:] Yes, I'm sure it is.

[Trial Court 28:] Does that make any difference in your ability to sit as a juror?

[Venireman 28:] No, it really doesn't.

[Trial Court:] Okay.

[Venireman 28:] As I said, you know, I didn't know anything about it. I was just surprised to hear that, that I actually was nervous as well.

[Trial Court:] Okay.

[Venireman 28:] I realize that I should have gave you a yes or no.

[Trial Court:] Okay. Any other questions?

[Defense Counsel:] The -- I've got to have [the court reporter] hear this. You have had a prior experience with your identity being stolen?

[Venireman 28:] Right. That was -- I'm sure you've all heard the T.J.Maxx thing, and we had gas purchases made on our American Express and our number was stolen.

[Trial Court:] T.J.Maxx?

11

[Venireman 28:] The T.J.Maxx thing.

[Defense Counsel:] That being the case, can you assure us that having had that happen to you you can be fair and impartial in an identity theft case?

[Venireman 28:] Yes. I believe the store, you know, at the time --

[Defense Counsel:] Nothing further, your Honor.

. . .

[Trial Court:] Thank you, ma'am.

[Defense Counsel:] Can we go off the record for a second?

[Trial Court:] Go off the record a second.

Following the off-the-record discussion, appellant moved to quash the venire panel:

[Defense Counsel:] Your Honor, given [venireman 28's] statement that there was discussion in the lunch room over our break about reports of this case being in the news, there being a ring of identity theft that was publicized, and in fact, it was back at one of [appellant's] arrests, I would ask the Court to quash this panel, give us a new panel of jurors that are not tainted by outside influence, respectfully on the record.

[Trial Court:] I'm going to deny that, but if you'd like I will admonish the entire panel now that any conversations or comments that they've heard are not evidence, and are probably factually incorrect.

[Defense Counsel:] Given that you've denied my objection on the record I would ask you once we have the ones that are going to be seated, you give that admonition.

[Trial Court:] And I'll definitely give that admonition. Do you want me to address anything with the panel as it is?

[Defense Counsel:] No.

A short time later, defense counsel raised the issue again:

[Defense Counsel:] One other thing before we adjourn, given [venireman 28's] declaration of the lunchtime chatter about the publicity in this case, she said there were two other people from the panel.

[Trial Court:] I think one was [venireman 18], for sure.

[Defense Counsel:] Without being presumptuous, given the Court's given me a ruling on the record objecting to quashing this panel because of the taint, I would ask for two other peremptory strikes be given to [appellant] to

hopefully insulate against that problem, your Honor.

[Trial Court:] That will be denied.

[Defense Counsel:] Thank you.

Finally, the trial court asked the following questions to the venire panel immediately before the parties made their peremptory strikes:

[Trial Court:] Ladies and gentlemen, there has been some discussion that apparently some of you sat at lunch and told what you thought you know about the case, which I can pretty much guarantee you is wrong, especially if you are relying on any kind of news reports, TV media, anything of that nature, 100 percent unreliable. Even if you did see any coverage it was a long time ago. That being said, I need to know if there was any person who has not already identified themselves as having formed an opinion in this matter, based on your conversations at the lunch table or any other thing, that you have not shared with us at this point in time? Is everybody that was either a party to the lunchtime chatter or otherwise thinks that they know what the case is about, even if they don't, that has not identified themselves at this time? All right. Thank you.

Accordingly, venireman 28 stated that the lunchtime conversation did not affect her ability to sit as an impartial juror. Moreover, the trial court told the entire venire panel that anything they discussed about the case during lunch was unreliable. The trial court then asked the panel whether the lunchtime conversation or any other factor caused them to have a preconceived opinion regarding the case; no venireman answered affirmatively. Under these circumstances, we hold the trial court acted within its discretion by denying the motion to quash. *See Mendoza*, 552 S.W.2d at 447. Appellant's second issue is overruled.

## IV. JURY ARGUMENT

In his third issue, appellant contends the trial court erred by overruling his objection to the State's jury argument. We review a trial court's ruling on an objection to jury argument for abuse of discretion. *Lemon v. State*, 298 S.W.3d 705, 707 (Tex. App.—San Antonio 2009, pet. ref'd).

During jury argument, the State made the following statements:

13

[Prosecutor:] Now, to wrap this up, [defense counsel] talked in a very persuasive, very intelligent, articulate way about world circumstances. World circumstances that actually, frankly, affect everybody in this room, or will affect our children or grandchildren, the way the world is changing regarding democracy. And I think I agree with everything that he said regarding people around the world wanting to be like us.

Along with rights come responsibility. Does everybody around the world want to live in our system if we can't make our own citizens responsible for their own behavior? Who's going to want to live in our system if what our system says is, you know what, you can get caught red-handed possessing these things, the police can follow you around and see you passing it off with their own hands, we can bring you photographs of people who admit to being involved in the crime with you, we can bring your partners in crime to tell you how we did it, who's going to want to live in the country where if that happens, he walks out the door with us? Is that your vision of America?

Or is your vision of America that we have a right to be safe, we have a right to expect that the judicial system will make people like him follow the law. And when he doesn't, citizens, his peers, will convict him. Because that's why there's some ability for us to feel somewhat secure in our identities, in our bank accounts, in our homes. Or is your America one where you get to do this and then you walk out the door with the jury, and with the lawyers --

[Defense Counsel:] Your Honor, I object. It's improper argument.

[Trial Court:] It's overruled.

[Prosecutor:] That's not -- that's not the image of America that we want. Because that's not America. America is we do have rights. With our rights come our responsibilities, and there are two responsibilities here. One, he has the responsibility to follow the law and not hurt people, not defraud people, not steal from people. That's his responsibility in our country. You have a responsibility in your country. Your responsib[ility] is to make sure when he breaks the law you find him guilty of it.

As mentioned by the prosecutor at the beginning of the foregoing record excerpt, defense counsel made similar, patriotic pleas during his jury argument:

[Defense Counsel:] We followed the law, we looked at the evidence, we tried to find anything else, anything independent that would link [appellant] to the crime, and it's simply not there. Because we will not in Harris County, in the state of Texas, or in the United States, in contravention of the constitution that our forefathers died for, substitute proof beyond a

14

reasonable doubt, evidence, with speculation, innuendo, or inference. We simply won't do that.

It is very telling in these times, there's unrest in many many countries unlike many of us have seen in our lives. In the Middle East, in Syria, further east, southern Europe, the Balkans, everywhere, people are [clamoring] for the rights, the liberties, and the guarantees of democracy that we live under.

Your verdict isn't just a verdict heard through the folks in this galley, in this courtroom, here in Harris County, it really speaks to a larger much more important statement. The lives that were lost for our Country's principles, the right to be judged by a jury of your peers, and guilt must be established by those peers beyond a reasonable doubt, is why we live in the best society, in the most coveted place on the face of the earth.

During jury argument, counsel is permitted to answer opposing counsel's argument. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). Therefore, the trial court would not have abused its discretion by overruling appellant's objection because the prosecutor was simply answering defense counsel's argument. *See Lemon*, 298 S.W.3d at 707. Appellant's third issue is overruled.

## V. ENHANCEMENT OFFENSE

Finally, in his fourth issue, appellant contends the trial court erred during the punishment phase by permitting the State to use a prior conviction for enhancement purposes that was not included in the indictment and of which appellant lacked proper notice.

Prior convictions used as enhancements must be pleaded in some form, but they need not be pleaded in the indictment. *Brooks v. State*, 957 S.W.2d 30, 34 (Tex. Crim. App. 1997). The right to notice of the State's intention to use prior convictions as enhancements is rooted in due process. *Villescas v. State*, 189 S.W.3d 290, 293 (Tex. Crim. App. 2006). Under a due process analysis, the issue is "whether appellant received sufficient notice of the enhancements so that he had an opportunity to prepare a defense to them." *Pelache v. State*, 324 S.W.3d 568, 577 (Tex. Crim. App. 2010).

During a punishment-phase discussion among the parties and trial court, the State

15

noted that it included two prior convictions in the indictment as enhancements but had agreed with appellant not to introduce one such conviction. In lieu of this prior conviction, the State explained it intended to introduce appellant's conviction in cause no. 135812. According to the State, appellant received proper notice of this intent. Although appellant objected that he never agreed to the State's use of his conviction in cause no. 135812 as a substitute enhancement, he ultimately admitted that he received notice of the State's intent to use the conviction for enhancement purposes. The State's written notice of enhancements included appellant's conviction in cause no. 135812; the State sent this notice to appellant five days before trial and eight days before the punishment phase. Accordingly, we hold the trial court did not err by implicitly determining appellant received sufficient notice of the enhancement. Appellant's fourth issue is overruled.

We affirm the trial court's judgment.


/s/      Charles W. Seymore
Justice


Panel consists of Chief Justice Hedges and Justices Seymore and Brown.

Do Not Publish — Tex. R. App. P. 47.2(b).