**Affirmed and Memorandum Opinion filed June 25, 2024.**



In The

# Fourteenth Court of Appeals

### NO. 14-23-00071-CR

## EX PARTE FRANCES NWOSUOCHA, Appellant

**On Appeal from the 185th District Court
Harris County, Texas
Trial Court Cause No. 1157990A**

## MEMORANDUM OPINION

Appellant Frances Nwosuocha appeals an order denying her post-conviction application for habeas corpus based on a claimed violation of *Brady v. Maryland*, 373 U.S. 83 (1963). We affirm.

### BACKGROUND

Federal and state investigators discovered rampant fraudulent billings for Medicare and Medicaid reimbursement for motorized wheelchairs in Harris County in the early 2000s. *Nwosoucha v. State*, 325 S.W.3d 816, 821 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). One of the durable medical

equipment companies under investigation was Silver-Hawk, which was owned and controlled by Bibian and Achor Uluocha. *Id*. Many of Silver-Hawk's billings relied on Certificates of Medical Necessity (CMNs) that Appellant, who was a nurse practitioner, had signed. *Id*. Medicare and Medicaid reimbursed Bibian and Achor's company based on twenty-three CMNs Appellant admitted signing; there was evidence they contained falsified information. *Id*. at 841. The total loss to Medicare and Medicaid for these CMNs was $113,979.56. *Id*.

In March 2008, Appellant was indicted for engaging in organized criminal activity in combination with Bibian, Achor, and others. *Id*. at 821. In October 2008, the case proceeded to trial. *Id*. at 823. A jury found Appellant guilty of engaging in organized criminal activity, namely aggregate theft by a governmental contractor of property with a value of over one hundred thousand dollars and under two hundred thousand dollars. *Id*. at 821. The jury assessed punishment at ten years' confinement, recommended community supervision, and assessed a $10,000 fine; the trial court sentenced Appellant accordingly. *Id*. This court affirmed Appellant's conviction in 2010. *Id*. at 821-44.

In January 2020, Appellant filed an application for a writ of habeas corpus pursuant to Texas Code of Criminal Procedure article 11.072[1] seeking relief from her conviction; she filed two amended applications thereafter. In her second amended application, Appellant contended that the State (1) failed to disclose

---

[1] Article 11.072 "establishes the procedures for an application for a writ of habeas corpus in a felony or misdemeanor case in which the applicant seeks relief from an order or a judgment of conviction ordering community supervision." Tex. Code Crim. Proc. art. 11.072, § 1; *see also Ex parte Villanueva*, 252 S.W.3d 391, 395 (Tex. Crim. App. 2008). Under the statute, a person who is serving or who has completed a term of community supervision may file a habeas application attacking the "legal validity" of (1) the conviction for which or order in which community supervision was imposed or (2) the conditions of community supervision. Tex. Code Crim. Proc. art. 11.072, § 2; *Ex parte Villanueva*, 252 S.W.3d at 395.

material evidence favorable to her in violation of *Brady*, and (2) used false testimony to secure her conviction in violation of her rights to Due Process. Appellant incorporated a memorandum with exhibits in support of her application.

In May 2021, the trial court held a hearing on Appellant's application. In December 2021, the trial court signed an order denying Appellant relief; the court also issued findings of fact and conclusions of law. Appellant filed a timely notice of appeal.

## ANALYSIS

While Appellant lists two issues in her brief, they are indistinguishable. Furthermore, she presents only a single argument contending the trial court erroneously denied her relief based on her claimed *Brady* violation. We also note that although Appellant cites the United States and Texas Constitutions in her issue statements, she makes no other mention of the constitutional provisions in her briefing. Therefore, we focus on addressing Appellant's contention that she was entitled to relief because the State failed to disclose material evidence in violation of *Brady*.

## I.    Standard of Review and Applicable Law

A writ of habeas corpus is an extraordinary remedy. *See Ex parte Smith*, 444 S.W.3d 661, 666 (Tex. Crim. App. 2014). We generally review a ruling on an application for writ of habeas corpus for an abuse of discretion. *Ex parte Contreras*, 640 S.W.3d 279, 282 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd); *see also Ex parte Garcia*, 353 S.W.3d 785, 787 (Tex. Crim. App. 2011). We decide whether a trial court abused its discretion by determining whether the court acted without reference to any guiding rules or principles, *i.e.*, whether the court acted arbitrarily or unreasonably. *Ex parte Contreras*, 640 S.W.3d at 282; *Ex*

3

*parte Allen*, 619 S.W.3d 813, 816 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd). A trial court abuses its discretion if its decision lies outside the zone of reasonable disagreement. *Ex parte Temple*, 636 S.W.3d 332, 336 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd); *Ex parte Allen*, 619 S.W.3d at 816.

In reviewing a trial court's ruling on an application for habeas relief, we examine the evidence in the habeas record in the light most favorable to the trial court's ruling. *Kniatt v. State*, 206 S.W.3d 657, 664 (Tex. Crim. App. 2006). The trial court is the sole factfinder in a post-conviction application for writ of habeas corpus filed under article 11.072. *Ex parte Torres*, 483 S.W.3d 35, 42 (Tex. Crim. App. 2016). We afford almost total deference to a trial court's factual findings when they are supported by the record, especially when those findings are based upon the witnesses' credibility and demeanor. *Id*. at 42. This deferential review applies even when the findings are based on affidavits rather than live testimony. *See Ex parte Wheeler*, 203 S.W.3d 317, 325-26 (Tex. Crim. App. 2006). We apply the same deference to review the trial court's application of law to fact questions if resolving those determinations rests upon an evaluation of credibility and demeanor. *Ex parte Allen*, 619 S.W.3d at 816. "[W]e review *de novo* the trial court's resolution of mixed questions of law and fact that do not turn on witness credibility and its resolution of pure questions of law." *Ex parte Beck*, 541 S.W.3d 846, 852 (Tex. Crim. App. 2017). We will uphold a trial court's ruling as long as it is correct on any theory of law applicable to the case. *Id*.

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Therefore, *Brady* is violated when three requirements are satisfied: (1) the State suppressed evidence;

4

(2) the suppressed evidence is favorable to the defendant; and (3) the suppressed evidence is material. *Ex parte Lalonde*, 570 S.W.3d 716, 724 (Tex. Crim. App. 2019); *Ex parte Richardson*, 70 S.W.3d 865, 870 (Tex. Crim. App. 2002). "Incorporated into the third prong, materiality, is a requirement that [the] defendant must be prejudiced by the state's failure to disclose the favorable evidence." *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006) (en banc).

Evidence is material only if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense. *Ex parte Lalonde*, 570 S.W.3d at 724. A reasonable probability is a probability sufficient to undermine confidence in the outcome of a proceeding. *Id*. Materiality is determined by evaluating the alleged error in the context of the entire record and overall strength of the prosecution's case. *Id*.; *Harm*, 183 S.W.3d at 409.

To prevail in a post-conviction application for a writ of habeas corpus, an applicant bears the burden of proving by a preponderance of the evidence the facts that would entitle her to relief. *Ex parte Lalonde*, 570 S.W.3d at 725; *Ex parte Richardson*, 70 S.W.3d at 870. "'Under *Brady*, an applicant bears the burden of showing that in light of all the evidence it is reasonably probable that the outcome of the trial would have been different had the prosecution made a timely disclosure.'" *Ex parte Lalonde*, 570 S.W.3d at 725 (quoting *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002)). "The mere possibility that the undisclosed information might have helped the defense or affected the trial's outcome does not establish materiality." *Id*.

Because the State concedes that Appellant established elements one and two, the parties address solely the third element. Thus, we also focus only on whether the undisclosed evidence was material.

## II.    Evidence and Relevant Findings of Fact

In the habeas proceeding, Appellant asserted that the financial analyst/fraud examiner Augustine Nnadi, who testified at her 2008 trial, had been involved in a bribery scheme with Achor in 2007[2] unbeknown to the prosecution.  Appellant claimed that, at her 2008 trial, there was no direct evidence she had received money from Bibian or Achor to prove she engaged in organized criminal activity in combination with Bibian and Achor.  According to Appellant, the only evidence from which the jury could have concluded she received money was admitted through the State's witness Nnadi.  Nnadi testified that State's exhibits 25G, 25H, and 25J — three checks written by Bibian to herself — had Appellant's name written in the checks' memo line.

Appellant asserted that "materiality is clear" because (1) the "evidence the State relied upon for conviction was introduced through Nnadi [and] was the only evidence implicating [Appellant] as having benefitted financially from the alleged scheme"; and (2) Nnadi's and Achor's alleged "ongoing criminal enterprise tainted the entire investigation" in 2007.  Therefore, Appellant claimed "[t]here is a reasonable likelihood that had the existence of a bribe between an alleged coconspirator and the State's agent been disclosed, the jury would not have made any inference that checks written by the wife of the person who bribed the State's agent could substantiate the guilt of [Appellant]."

In support of her application, Appellant presented to the trial court:  (1) the 2008 indictment and judgment of conviction; (2) documents relating to her

---

[2] Allegedly, Nnadi had informed Achor of a pending arrest warrant in 2007 for engaging in organized criminal activity to commit Medicaid and Medicare fraud with Bibian and Appellant; Achor fled to Nigeria after receiving that information and later met with Nnadi in Nigeria where Achor paid Nnadi $5,000.  Achor did not return to the United States until October 2013.

community supervision and time served; (3) this court's opinion affirming her 2008 conviction; (4) excerpts from Nnadi's and Appellant's 2008 trial testimony and copies of the three checks Bibian wrote to herself; (5) a 2014 criminal complaint and supporting affidavit alleging Nnadi accepted $6,000 in February 2014 from Achor in return for Nnadi recommending a lower amount of restitution to the prosecutor handling Achor's fraud case; and (6) the 2014 indictment for bribery and Nnadi's subsequent plea agreement.

The State asserted that (1) Appellant cannot show "that because of the accusation [that Nnadi accepted a bribe from Achor in 2007], everything this witness said at trial should not be trusted and therefore the State's only connection between the applicant and the crime could not have been made and [the State] wouldn't have had a case to take to trial"; and (2) Appellant failed to show "by a preponderance of the evidence that had the accusation about Nnadi taking a payment from a coconspirator for information had been disclosed pretrial or during the trial, the results of the trial would have been different."

The State presented two affidavits; the first was from attorney Joni Vollman, in which she averred in relevant part:

> I was employed by the Harris County District Attorney's Office from 1993 until 2012, and during that time . . . I investigated and prosecuted hundreds of financial crimes, including many thefts involving fraud in the Medicare and Medicaid programs. I routinely presented bank records and used fraud examiners or analysts in trial. I was one of two prosecutors assigned the above-numbered case involving the defendant Frances Nwosuocha and represented the State in trial.
>
> At the time of trial in 2008, I was not aware of an allegation that the financial analyst from the Texas Attorney General's Office, Augustine Nnadi, accepted a bribe from a co-conspirator in this case. . . .

7

Had I known pre-trial or during trial of the allegation against Nnadi, the bank records would have been reassigned and reviewed by another analyst from the Attorney General's Office. That analyst would have then testified in the trial and testified about the bank records for the jury. Based on my experience investigating and prosecuting these types of financial crimes, bank records are routinely admitted into evidence independent of a witness as a business record accompanied by a notarized Business Records Affidavit. Based on my experience, any qualified fraud examiner, analyst, or investigator is able to review the bank records and testify to the contents of the documents. In this case, as far as I remember, nothing Nnadi testified to from the witness stand was an opinion or conclusion, but rather merely giving a voice to the bank records for ease of delivering the information on the documents to the jury. This was testimony that could have been presented by any qualified analyst.

The second affidavit was from Bryan Vaclavik, in which he averred in relevant part:

I am currently the Chief Fraud Examiner in the Financial Crimes Division of the Harris County District Attorney's Office where I have worked for twenty-five (25) years. . . . I have testified in state and federal court in excess of two hundred (200) times and been repeatedly certified as an expert witness. I have served as the primary case agent on more than three hundred (300) financial crime related cases; been involved in some capacity [in] over five hundred (500) criminal cases.

In investigating criminal cases with financial records[,] one of the fraud examiner's, also called a financial analyst, roles is to condense voluminous records into various summaries and, if needed at trial, to narrate those records for the court and jury. Financial records are collected during an investigation using grand jury subpoenas. The records provided pursuant to the subpoena are accompanied by a notarized Business Records Affidavit (BRA) for authenticity. . . .

Bank records are static and not altered by a fraud examiner or analyst. When testifying in court, my role is to present the summaries while speaking to its information. . . . What I cannot do, ethically, as a certified fraud examiner is draw any conclusions from the records

about criminal activity or speculate about what the records mean. I can only provide testimony as to the actual financial transactions and what information appears on the face of the documents under questioning from both the state and the defense counsel.

Once the financial records are reviewed and summarize[d], I may be subpoenaed to provide testimony. However, should I be unavailable to provide such sworn testimony, another fraud examiner or analyst can intercede, sponsoring the summaries of said financial records. The replacement witness would need to review the same records and summaries. Only after they reviewed and are comfortable with all the transactions that are included, would he or she be able to testify truthfully in court. Because of our role as a witness who speaks on behalf of the bank documents, any fraud examiner can review the bank records and without knowing anything about the facts of the case on trial is able to testify as to what is in the bank records.

After considering "the application for writ of habeas corpus, including all amendments and subsequent additions, the State's answer and exhibits, official court records in the above-captioned and original cause, and May 13, 2021 argument from habeas counsel and the State," the trial court signed the following relevant findings of fact:

6. The Court finds the November 9, 2020 affidavit of Harris County District Attorney's Office Chief Fraud Examiner Bryan Vaclavik credible and the facts asserted therein to be true.

7. The Court finds the November 10, 2020 affidavit of former Harris County Assistant District Attorney ("ADA") Joni Vollman credible and the facts asserted therein to be true.

10. The Court finds that the applicant fails to provide proof by a preponderance of the evidence that in 2007, Nnadi accepted a bribe from the applicant's co-defendant's husband who told federal authorities in 2013 he paid Nnadi to tell him when an arrest warrant was issued so he could flee the country.

14. The Court finds that the contents of bank records certified with a business record affidavit do not change, therefore any qualified witness is able to give voice to the records for the purposes of presentation to a jury.

9

15.    The Court finds that the role of financial analyst Nnadi in the applicant's trial was to objectively present the information in the bank records to the jury by giving voice to what information was included in the documents, information the jurors could see with their own eyes.

16.    The Court finds that Nnadi's trial testimony encompassed the presentation of more than two-hundred (200) bank transactions, one hundred ninety (190) exhibits, most of them checks, from eight (8) different bank accounts, including State's exhibits 25G, 25H, and 25J.

17.    The Court finds that at no time did Nnadi provide information about State's exhibits 25G, 25H, and 25J beyond what appears on the face of the checks as admitted from the bank business records.

18.    The Court finds that Nnadi was not asked, nor did he offer, an opinion or belief that the applicant was doing anything illegal or committing any offense.

19.    The Court finds that the information Nnadi provided from the bank records for the jury's consideration was free of any conclusions and speculation.

20.    The Court finds that even without Nnadi's testimony, the bank records were part of the trial record for the jury's consideration.

21.    The Court finds that Nnadi's testimony from the bank records accurately reflects the information contained in the bank records, which was admitted into evidence at trial prior to the start of testimony.

23.    The Court finds that Nnadi did not opine for the jury any information about the applicant benefitting financially from any transaction reflected in the bank records, nor speculate about whether the applicant received any money.

24.    The Court finds that Harris County District Attorney's Office Fraud Examiner Shannon Hogan testified during the applicant's trial after Nnadi testified.

25.    Hogan testified that she examined the applicant's bank records and sorted the transactions looking for cash transactions.

30.    The Court finds that it was fraud examiner Hogan's testimony that provided the State's case an inference or connection between State's Exhibits 25G, 25H, and 25J, and the applicant's cash deposits

10

into her personal bank account.

31.     The Court finds that Nnadi's testimony did not . . . make the connection between State's Exhibits 25G, 25H, and 25J, and cash deposits into the applicant's personal bank account.

32.     The Court finds that in closing arguments, the State did not refer to any testimony from Nnadi.

33.     The Court finds that in the appellate opinion affirming the applicant's conviction, neither Nnadi's name nor testimony are mentioned.

34.     The Court finds that the appellate opinion affirming the applicant's conviction specifically cites the connection between the three checks (State's Exhibit 25G, 25H, and 25J), and the subsequent cash deposits:  "[t]he evidence consisted of three checks Bibian wrote herself on Silver-Hawk's bank account on which she noted 'Frances' in the memo line and cash deposits to appellant's bank account shortly thereafter.  From this evidence a jury could infer appellant intended to participate in the profits of the combination."

35.     Given the limited scope of Nnadi's testimony, and the absence of any personal opinion, inference, or speculation during Nnadi's testimony, and the State's inculpatory evidence outside of Nnadi's testimony, the applicant fails to establish that Nnadi's testimony gave the jury a false impression of the facts.

36.     Given the limited and scope [sic] nature of a financial analyst's testimony, the Court finds that Nnadi could have been replaced with another qualified financial analyst without any substantive change to the testimony presented.

(citations to the habeas exhibits and original trial record omitted).

## III.     Materiality of Evidence

Appellant contends the trial court abused its discretion when it found that undisclosed evidence of Nnadi's alleged acceptance of a bribe from Achor in 2007 was not material to her conviction.  In that respect, Appellant claims the "entire investigation was tainted by the fact that Nnadi was actively providing information to the Uluochas."  She claims that evidence of the alleged bribery "would have

destroyed any probative value the 'circumstantial evidence' of the checks written by Bibian to herself" had, and it "would have destroyed the only evidence linking [Appellant] to any financial gain" and wrongdoing. We disagree.

The record does not support Appellant's contention that evidence of the alleged bribe "would have destroyed any probative value the 'circumstantial evidence' of the [three] checks written by Bibian to herself" had, and it "would have destroyed the only evidence linking [Appellant] to any financial gain" and wrongdoing. In that regard, the trial court found that (1) because the bank records, including the three checks (exhibits 25G, 25H, 25J), had already been admitted with a business record affidavit prior to the start of testimony, they were a part of the trial record for the jury to consider and the content of bank records certified with such an affidavit does not change so that any qualified fraud examiner is able to give a voice to the records; (2) Nnadi's role in Appellant's trial was limited "to objectively present[ing] the information in the bank records to the jury by giving voice to what information was included in the documents, information the jurors could see with their own eyes," and Nnadi fulfilled his limited role with accurate testimony about the information contained in the bank records; (3) Nnadi provided no information at trial about the three checks "beyond what appears on the face of the checks as admitted from the bank business records"; (4) Nnadi was not asked nor did he offer an opinion or speculate whether Appellant did anything illegal, committed any offense, benefitted financially from any transaction reflected in the bank records, or received any money; and (5) considering the limited nature of Nnadi's testimony, it "could have been removed from the trial, and . . . the evidence against the applicant would have remained the same and allowed the jury to reach the same verdict."

Moreover, the trial court found that fraud examiner Hogan, who testified

12

after Nnadi, was the one who provided the connection between the three checks (exhibits 25G, 25H, 25J) and Appellant's financial gain and wrongdoing. It found Hogan testified that (1) she examined Appellant's bank records and sorted the transactions looking for cash transactions; (2) "Exhibit 25G was a check for $4,000 that was cashed by a co-defendant, and that six days later, the applicant deposited a similar amount of cash into her own account;" (3) "Exhibit 25H was a $950 check written by a co-defendant and cashed, and that two days later the applicant deposited $970 cash into her own account;" and (4) "Exhibit 25J was an $800 check written and cashed by a co-defendant, and that four days later, the applicant deposited $1,400 cash into her own account." The court also found that in closing arguments, "the State argued the connection between [the three checks], and the temporal proximity between the checks and the cash deposits into the applicant's personal bank account as proof that the applicant shared in the proceeds of the criminal activity." Again, Appellant does not challenge or disagree with these court findings.

Additionally, the State presented evidence from various sources showing Appellant's involvement in the Medicare and Medicaid fraud scheme with Bibian and Achor, and we thus noted in our opinion on direct appeal that "[t]here was also substantial evidence appellant participated in combination with Achor and Bibian in their Silver-Hawk operation." *See Nwosoucha*, 325 S.W.3d at 833. Detailing the evidence in our opinion, we stated, among other things, that (1) a Silver-Hawk runner testified she saw Appellant answering telephones at Silver-Hawk and Bibian introduced them; (2) Appellant admitted she traveled with Bibian to Palestine, Texas three times; (3) Appellant signed seventeen CMNs in two days for identical equipment for persons she saw in groups in Palestine; (4) Medicare and Medicaid reimbursed Bibian and Achor's company based on twenty-three CMNs,

13

which Appellant admitted signing and for which there was evidence they contained falsified information; and (5) Bibian wrote three checks to herself on Silver-Hawk's bank account noting "Frances" in the memo line, and Appellant deposited large amounts of cash to her bank account shortly after Bibian wrote these checks. *Id*. at 833-41.

Appellant also claims the State acknowledged that evidence of the alleged 2007 bribe was material because the "State explained, in an interoffice memo in 2014, that Nnadi's actions were part of the decisional process to dismiss the [fraud] case against Achor" and, therefore, the same evidence the State cited as a reason why a prosecution against Achor would not be successful is material in Appellant's case.

The July 10, 2014 interoffice memorandum Appellant points to provides:

Uluocha was charged with 1st degree Engaging in Organized Criminal Activity to commit Medicaid and Medicare Fraud alongside his wife Bibian Uluocha and Frances Nwoshuocha. This case was originally filed in 2007 and covered criminal activity from March 2002 to June 2003. Uluocha was submitting billings for motorized wheelchairs and providing less expensive scooters to recipients. The total theft as alleged in the indictment was approximately $150,000.

Prior to indictment in 2007[,] Uluocha left the US and returned to his native Nigeria. His wife Bibian remained and pled guilty receiving probation. Nwoshuocha was convicted at trial in 2009 of signing false certificates of medical necessity.

Uluocha returned to the US in October 2013. Unfortunately between the original indictment and 2013, at least 26 of the witnesses, many of who testified in the trial against Nwoshuocha had passed away. Several more have become incapacitated or not locatable. Included in this group was unindicted co-conspirator Lewis Gottlieb, a former doctor convicted on federal charges, who testified against Nwoshuocha. Without these witnesses, prosecution was no longer feasible.

Additionally, the original auditor on this case, Augustine Nnadi pled

guilty to the federal charge of accepting a bribe and was sentenced in July 2014. Uluocha provided the information and assistance to the FBI that led to the arrest and conviction.

We note that the memorandum states Nnadi pled guilty to the federal charge of accepting a bribe in 2014 — not in 2007. In fact, the memorandum does not mention any allegation that Nnadi accepted a bribe in 2007 nor is there evidence that Nnadi acknowledged any guilt regarding the alleged 2007 bribe as was the case when he pled guilty to accepting a bribe in 2014.

Further, the memorandum expressly states that prosecution of Achor "was no longer feasible" because many witnesses have passed away, have become incapacitated, or could not be located. The trial court considered the memorandum and found that "the State's dismissal memo regarding co-defendant Achor Uluocha is not dispositive on the issue of Nnadi's materiality to the State's case, and cites the death of twenty-six (26) witnesses in the case as a barrier to prosecution."

We are not persuaded by Appellant's contention that there is "a reasonable likelihood that had the existence of a bribe between an alleged coconspirator and the State's agent been disclosed, the jury would not have made any inference that checks written by the wife of the person who bribed the State's agent could substantiate the guilt of Nwosuocha."

As we stated, evidence is material only if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense. *Ex parte Lalonde*, 570 S.W.3d at 724. But here, Nnadi's testimony was limited to giving a voice to the content of the already admitted bank records, which any other qualified financial analyst could have done without any substantive change to the testimony presented. Nnadi's testimony did not provide the connection between the three checks and Appellant's participation in the fraud scheme nor did he testify that Appellant benefitted financially from these checks or

15

was involved in any illegal activity.

Based on the record, we cannot conclude that evidence of Nnadi allegedly accepting a bribe from Achor was material because there is not a reasonable probability the result of Appellant's trial would have been different had the evidence been disclosed to the defense. We conclude that the trial court did not abuse its discretion in (1) determining Appellant failed to establish by a preponderance of the evidence that the undisclosed evidence was material, and (2) denying Appellant post-conviction habeas relief.

Accordingly, we overrule Appellant's issues.

## CONCLUSION

We affirm the trial court's order.

/s/     Meagan Hassan
Justice

Panel consists of Justices Hassan, Poissant, and Wilson.

Do Not Publish — Tex. R. App. P. 47.2(b).

16